WUNDERLICH and another, Respondents, vs. THE PALATINE. FIRE INSURANCE COMPANY and others, imp., Appellants.

*October 2 — October 20, 1899.*

*Evidence: Examination of adverse party: Offer of portions: Immaterial* *error: Special verdict: Taking exhibits to jury room: Appeal: Suf-* *ficiency of evidence to sustain verdict: Fire insurance: Proofs of* *loss: Fraud: Improper remarks of counsel.*

1. The party at whose instance the examination of an adverse party was had may introduce in evidence portions of it relating to a particular subject, and the other party will then have the right to read additional portions as explanatory thereof; but the exclusion of portions of the deposition on the ground that none of it can be received unless all is offered will not warrant a reversal, where the record fails to show a sufficiently definite offer and it is not clear that the party making the offer suffered any injury from being compelled to introduce the entire deposition.

2. Where the questions submitted for special verdict cover all the material issues involved, a refusal to submit more specific questions is not error.

3. The trial court may, in its discretion, without the consent of counsel, permit the jury, while deliberating, to examine the exhibits.

4. A verdict supported only by testimony which is contrary to the great weight of the evidence and is impeached or rendered improbable by other conceded facts or is against all the reasonable inferences or probabilities in the case will not, on appeal, be permitted to stand, even though the trial court refused to set it aside. *Bank of Commerce v. Ross*, 91 Wis. 320, criticised.

5. In an action upon fire insurance policies a special verdict finding that plaintiffs had not made any false entries in their books or false statements in their proofs of loss, etc., but finding that the amount of property destroyed was much less than the amount claimed in such proofs and shown by the books, is *held* to be inconsistent and contrary to the great weight of evidence and against all reasonable probabilities in the case.

6. In a close case, repeated references by counsel in his argument to the jury to matters not in evidence, which have a tendency to influence the minds of the jury against the opposing party, may necessitate a reversal, even though the jury were directed to disregard them.

Wunderlich and another vs. The Palatine Fire Ins. Co. and others.

APPEAL from a judgment of the circuit court for Langlade county: JOHN GOODLAND, Circuit Judge. *Reversed.*

This is a consolidated action brought by plaintiffs upon nineteen policies of insurance, aggregating $20,500, covering certain lumber owned by them, which, it is claimed, was destroyed by fire on May 6 and 7, 1898. The defendants answered, admitting the fire and compliance with the conditions precedent as to notice and proofs of loss, and denying the value of the property destroyed. The answer also sets up, as a defense, fraud and false swearing by the plaintiffs in relation to the subject matter of the insurance, under a condition in the policy which says: "This entire policy shall be void . . . in case of any fraud or false swearing by the insured touching any matter relating to this insurance, or the subject thereof, whether before or after loss." It was charged that the plaintiffs were guilty of fraud and false swearing in their proofs of loss, and also in their examination under the policy, wherein they stated their loss to be 3,011,032 feet of lumber, besides some bicycle strips and shingles, well knowing that such statements were false. These false statements were alleged to have been made for the purpose of deceiving the defendants as to the amount of the actual loss by said fire, and by that means obtaining payment of a sum largely in excess of the real loss sustained.

A special verdict was returned by the jury, in which they found (1) that the lumber was wholly destroyed by fire on the night of May 6, and morning of May 7, 1898; (2) that said lumber was insured in the sum of $24,000, and that the defendants carried insurance thereon in the sum of $20,500; (3) that the plaintiffs did not make any false entries in any of their books of account relating to the insurance or the subject thereof; (4) that the plaintiffs did not swear falsely, either in their proofs of loss or in their examination under the policies, touching any matter relating to the insurance or the subject thereof; (5) not answered; (6) that the amount of lumber destroyed by fire was 2,602,544 feet, bicycle strips

17,761, shingles 498½ thousand; (7) that the value of the material destroyed was $27,109.75.

The proofs of loss showed the aggregate amount of maple, birch, ash, pine, rock elm, soft elm, basswood, hemlock, and cedar lumber destroyed, with the price per thousand feet. The total number of feet was placed at 3,011,032, of the value of $31,691.16, including the bicycle strips, 17,761 pieces. The shingles were valued at $373.88, making the total value of the property destroyed $32,065.04.

The amount of lumber destroyed seems to have been arrived at in the following manner: The plaintiffs claimed to have made an inventory on December 29, 1897. To this they added logs cut that winter on a quarter section of land they had purchased, and logs purchased of farmers, and from the total deducted lumber sales up to the time of the fire and logs unsawed at that date. From these figures we get the following:

| | |
|---|---:|
| Inventory December 29, 1897 | 1,606,739 |
| Logs from S. E. ¼ 20, 31, 12 | 1,187,720 |
| Logs purchased | 454,730 |
| | 3,249,189 |
| Lumber sales | 100,000 |
| Logs unsawed | 125,000 |

The defendants claimed that the inventory had been padded, and that no such amount of lumber was on hand; that the scale of the logs cut on plaintiffs' land had been fraudulently increased over 300,000 feet; that the amount of logs purchased from farmers had been increased 100,000 feet; and that such increase had been in the most valuable kinds of logs.

A motion to set aside the verdict was denied, and judgment was entered for the plaintiffs. The insurance companies have brought this appeal.

For the appellants there was a brief by *Mylrea & Bird*, and oral argument by *W. H. Mylrea* and *C. B. Bird*.

*T. W. Hogan* and *John Barnes*, for the respondents.

BARDEEN, J. 1. Upon the trial the defendants offered certain portions of the plaintiffs' testimony taken upon their examination as adverse parties under the statute. This was objected to on the ground that none of it should be received unless it was all offered, which objection was sustained. Thereupon the defendants offered the whole examination in evidence under protest. One difficulty with the defendants' complaint is that the record fails to disclose what portions of the deposition they desired to offer in evidence. The prevailing rule is, as we think, that either party may read such parts of a deposition as are relevant and relate to any distinct transaction, and that the other party may introduce such other portions as relate to the same subject and tend to explain that which has been read. Jones, Ev. § 703; *Parmenter v. B., H. T. & W. R. Co.* 37 Hun, 354; *Smith v. Crocker,* 3 App. Div. 471; *Parker v. Chancellor,* 78 Tex. 526; *Watson v. Winston* (Tex. Civ. App.), 43 S. W. Rep. 852; *Dawson T. & G. Co. v. Woodhull,* 67 Fed. Rep. 451. The court was evidently wrong in holding that the entire deposition must be offered, but we should not feel justified in reversing the case on that ground, because the record fails to show a sufficiently definite offer by defendants, and it is not clear that they suffered injury from being compelled to offer the entire examination. Of course, in examinations of this kind, the plaintiff would have no right to offer the deposition so taken in the first instance; but should the defendants offer a portion relating to a given subject, the other side would have the right to read additional portions as explanatory thereof.

2. Considerable criticism is made because the court failed to include in the special verdict certain questions requested by the defendants. The verdict submitted seems to cover all the material issues in the case. The questions requested relate to specific charges of fraud in the plaintiffs' transactions, and the court might, in the exercise of a proper dis-

cretion, have divided up the issue on that question. Questions 3 and 4, taken in connection with the charge of the court, seem to cover the issues involved, and if there were no other errors the judgment would have to stand.

3. While the jury were deliberating they requested to be allowed to examine some of the exhibits that had been introduced in evidence. The defendants objected as to some of the exhibits, and the plaintiffs as to others, and the court held that it was improper to allow any of them to be inspected by the jury, except by consent of counsel. This is. claimed to be error. The court was certainly wrong as to his power in that regard. The matter rests in the wise discretion of the court. 2 Thomp. Trials, § 2575; *Baxter v. C. & N. W. R. Co.*, *ante*, p. 307. It is a power to be exercised with prudence and discrimination. Situations might arise when the jury might be greatly helped by an inspection of some books or writing in evidence. Trial courts are well able to take care of these matters, and it would be an extreme case, with apparent injustice, that would warrant interference by this court.

4. We come now to the most serious question in the case. We are asked to set aside the findings of the jury on the question of fraud and false swearing, as being inconsistent and contrary to the overwhelming weight of the evidence. The importance of this question to the parties, and the large amount involved in this litigation, has led us to examine the evidence with great care, and to canvass it in all its various aspects. Many cases have been decided in this court in which the rules that govern in cases of this kind have been laid down. That they are not all in perfect accord is certain, but running through them all is the underlying principle that, when all the reasonable probabilities, together with the overwhelming weight of testimony, is against the verdict, it cannot stand, even though it has passed the scrutiny of the trial court. In *Bank of Commerce v. Ross*, 91

Wis. 320, Mr. Justice Pinney stated the rule to be that where there was evidence on both sides of a question, and the court below had denied a new trial, this court was powerless to grant relief, unless it could be said that there was an *entire want* of competent evidence to support the verdict. This was stating the rule with greater strictness than was ever laid down in any case before or since. Such a rule would practically foreclose this court from examining into the evidence in a case, if it were found that one witness had sworn to the existence of facts that would support the verdict, although he might be impeached by all of the surrounding circumstances. Great deference is always paid by this court to the decision of the lower court upon questions of evidence, but cases arise when it is apparent that the judge has overlooked or ignored some of the potent facts in the case, and has suffered a verdict to stand when it ought to have been set aside. In *Badger v. Janesville Cotton Mills*, 95 Wis. 599, it was said: "The jury will not be warranted in finding the existence of a fact on the positive testimony of a witness, which is contrary to conceded facts or matters of common knowledge, or to all reasonable probabilities." This rule has been approved in *Roth v. S. E. Barrett Mfg. Co.* 96 Wis. 615; *Flaherty v. Harrison,* 98 Wis. 559; *Lee v. C., St. P., M. & O. R. Co.* 101 Wis. 352, and other cases. When it appears that the trial court has sustained a verdict upon testimony contrary to the great weight of the evidence, and which is impeached or rendered improbable by other conceded facts in the case, or is against all the reasonable inferences or probabilities in the case, this court is bound to, and will, interfere for the relief of the aggrieved party.

With these principles of law in mind, we will proceed to a consideration of the facts in this case. The jury have found that plaintiffs made no false entries in their books; that they were not guilty of any false swearing, either in the proofs of loss or in their examination under the policy;

that the lumber destroyed was 2,602,544 feet, exclusive of the bicycle strips and shingles; and that it was all of the value of $27,109.75. If there had been no false entries in their books or inventory, and no false statements made as to the amount of the property destroyed, in absence of other testimony, one would naturally look for harmony between the amounts claimed by the plaintiffs in their proofs of loss and the amount found by the jury. The proofs of loss furnished defendants, taken from their books, show that they had on hand 3,011,032 feet of lumber, or about 400,000 feet more than found by the jury. The total property destroyed was valued in the proofs of loss at $32,065.04, or nearly $5,000 more than the value found by the jury. These facts may not be of any special significance in themselves, but, when it is considered how the plaintiffs came to arrive at the amount of lumber on hand, we are not able to harmonize the answers of the jury. Assuming that there were no false entries in the books or inventory, as the jury have found, then certainly the jury should have found the *amount* of lumber destroyed to correspond to the amount shown thereby. We get from the books and the testimony of the plaintiffs the following figures:

Lumber in the inventory ............................... 1,606,739 feet.
Logs from their land .................................. 1,187,720   "
Logs purchased ....................................... 454,730   "

Total ...........  ................................. 3,249,189   "

From this amount, under the undisputed testimony, there should be deducted 286,591 feet of lumber sold, and, according to plaintiffs' claim, 124,103 feet of logs on hand. This would leave over 230,000 feet more lumber than the jury found, and does not take into consideration any overrun in the manufacture of the logs, which, under the testimony, would be from ten to fifteen per cent. Under no possible theory of the evidence can the figures shown by the books

and the inventory be harmonized with the findings of the jury. Either the books are false or the jury's answers are wrong. But, assuming that these inconsistencies alone are not sufficient to overturn the verdict, we will inquire into the evidence touching the amount of lumber on hand at the time of the fire. In making up this amount, the proof shows that three items were considered: logs purchased from farmers, logs cut on a quarter section owned by plaintiffs, and an inventory made by them December 29, 1897. The most of the testimony in regard to these matters was given by the plaintiff *Henry*, who was the bookkeeper and log scaler and had general charge of these matters. On his examination before suit, under the policy, he gave the amount of logs purchased from farmers as 454,730 feet, which is the same amount that is included in making up proofs of loss. Upon his examination as an adverse party he gave a list of the farmers, with the amounts corresponding with amounts shown by his scale books and with his books of account. He gave substantially the same testimony on the trial, and this item of the loss depends mainly upon his testimony.

The logs in question were purchased from some twenty different farmers, and scale was kept in two scale books by the plaintiff *Henry*. The logs so delivered were also credited on the firm's ledger. The defendants claim that there are over 100,000 feet of these logs credited to six different farmers that were never in fact delivered by them and never paid for. *Henry* testifies that the logs were all delivered, scaled, and credited, and all or the most of them paid for. The farmers in question were each called as witnesses, and five of them deny positively and unequivocally having delivered the portion of the logs in dispute, and deny ever having received pay therefor. One Albert Rabe is credited with 17,610 feet of logs, consisting of birch, basswood, and soft and rock elm, of the value of $69.35. He insists that he only delivered about 2,000 feet of rock elm to pay for

sawing some hemlock lumber. On one of the pages of the scale book is a credit which about corresponds with this claim. The remainder were delivered at a later date, but the ledger account fails to show the time. *Henry* testified that the logs were delivered, and a cash settlement made with Rabe's mother. The latter, being called, said that her son only delivered about 2,000 feet of elm logs, and that she received 150 pounds of flour, a pair of rubbers worth seventy-five cents, and forty-five cents worth of sugar, and no money. William Schmule is credited with 32,840 feet of logs. This witness had a pass book, and says that *Henry* scaled and entered all logs he hauled therein. The logs in dispute, amounting to about 16,000 feet, are all on one page of the scale book kept by *Henry*, and do not appear on the witness's books. They are credited on the ledger with the date left blank. He admits a settlement for the logs shown on the pass books, and says that he hauled no other logs. Charles Schuman is credited with over 19,000 feet more than his pass book shows, and more than he claims he hauled. He settled with plaintiffs on the basis of the logs shown on the pass book, and took receipt, which was offered in evidence. The logs credited, not shown on his pass book, show that he has a balance of $53.49 due him of which he knew nothing. Another witness, Herman Krueger, had no pass book, and thinks he drew only 10,000 or 15,000 feet, but is credited with over 30,000 feet. Louis Roehmer had a pass book which showed all the logs he hauled, all rock elm, and that he settled by the scale in his books. He was not certain as to the delivery of basswood, but did not deliver any soft elm or birch logs, and did not receive the sum in cash, as shown by the plaintiffs' ledger account. Borneman, another witness, says he sold them some rock elm and maple, as near as he could tell about 2,000 feet. Did not cut any basswood logs that winter. Hauled the logs he sold them to pay a saw bill. The ledger

account shows a credit of a few dollars. In considering
this phase of the case, it is significant to note that each one
of these several witnesses disagrees with the witness *Henry*
in very important particulars. If it were but one or two
instances, it might be excused on the ground of mistake.
These witnesses are all disinterested. They are farmers
living in the country, and to them transactions of this kind
are important. It is against all human probability that
these men should have hauled these logs and not known
anything about it. The scale books and ledger accounts
are in such shape as to raise suspicions that they had been
padded, and, when compared with the farmers' pass books,
the conclusion is well-nigh irresistible that some one is in
the wrong. The witness *Henry* is utterly unable to explain
these differences on any reasonable hypotheses. He simply
adheres to the proposition that he purchased these logs and
paid for them.

Turning now to logs cut from lands owned by plaintiffs,
the defendants insist that the scale books showing the logs
taken from these lands have been padded to the amount of
over 300,000 feet. The timber was logged by three different
contractors. The scale was kept in books marked Exhibits Y
and Z. These books show the number of feet to be as here-
tofore stated, as claimed by the plaintiffs, and the amount
was testified to by the plaintiff *Henry*. The alleged excess is
found on Exhibit Y, on eleven pages, almost immediately
following the alleged false entries in relation to the farmers'
logs. *Henry* claimed that they had men cutting on the land,
and that these logs were hauled by their own teams. Each
one of the contractors testified that the logs were cut by
their own men, and none were cut by the plaintiffs. When
the logs were hauled, they kept in the scale book the name
of each teamster, but that was omitted on these pages in
question. A ledger account was kept with the contractors,
and the total number of feet credited to them is 885,740

Wunderlich and another vs. The Palatine Fire Ins. Co. and others.

feet, and for this amount they were settled with and paid. The logs on these eleven pages seem never to have been credited to the contractors, and *Henry* is entirely unable to explain the discrepancy. Excluding these pages, the books show 886,730,— a few feet more than the contractors' account shows. The land was looked over and scaled by two timber scalers. One made 2,996 trees, scaling 896,128 feet. The other, a witness for plaintiffs, found 3,109 trees, with 1,207,702 feet. With only 113 more trees, he finds over 300,000 feet more of lumber than the other scaler. His scale was tested by another scaler of large experience, and was found to overrun the latter's scale to quite an amount. A significant fact in this connection is that the number of logs found on the scale books, excluding the eleven pages, is 8,179, and the number found by plaintiffs' scaler, above referred to, is 8,379. The eleven excluded pages show 2,044 logs, or over 1,700 logs more than the top and stump scale shows. While the scale made by their scaler tends to corroborate the scale in the books as to the number of feet, it impeaches it as to the number of logs. The testimony of *Henry* on this branch of the case is far from satisfactory. He is contradicted by the contractors in all important particulars. His scale book and ledger accounts do not agree, and he is unable to give any satisfactory explanation of the differences. Right here may be noted a fact of some significance. · The logs shown on the scale books, excluding the eleven pages, average about 108 feet to the log, while those on the excluded pages average over 147 feet to the log. It hardly seems credible that any such difference could exist. If the scale made by *Henry* of the logs first mentioned is correct, it tends to impeach the scale made by their scaler in the woods, as his scale shows that the logs average over 142 feet to the log. There is nothing in the case to reconcile these differences, except the testimony of the plaintiff *Henry*. He is unable to harmonize his state-

ments with his ledger account, and he is disputed by the other witnesses and by every reasonable probability. So strong are these facts that his story seems incredible.

As to the alleged inventory, the testimony is not quite so positive against its integrity. On December 29, 1897, the yard is said to have contained 1,606,739 feet of lumber. This was included in the proofs of loss, and from which they deducted 100,000 feet as lumber sold before the fire. On the trial the plaintiffs admitted that they had sold 286,591 feet, showing that the loss was swollen 186,591 feet, of the value of about $1,800. *Henry* appeared before the board of review of the town, and claimed that he had only about 700,000 feet of lumber in the yard, and said he did not think he was sworn. The town clerk testified that he was sworn and said he had only 700,000 feet, one half culls. The assessor called to support the plaintiffs said he estimated the lumber at about 2,000,000 feet, in 100 piles, which he counted. It was conclusively shown that, if there was only that number of piles, there could not have been any such amount of lumber, according to the size of the piles. During the summer and fall of 1897 the plaintiffs had repeated inquiries as to the stock on hand from would-be purchasers. They sent out stock sheets to the inquirers, which were introduced in evidence. These statements show less than one fourth the amount of timber on hand for sale they claim they had in December following. About December 1st the Mississippi Valley Lumberman sent out inquiries to ascertain the amount of lumber on hand. A postal card was introduced in evidence, claimed to be in the handwriting of one of the plaintiffs, upon which it is shown that their stock of hardwood was 900,000 feet. During the forepart of the year 1898 several buyers visited the yard and looked it over, and from a casual examination estimated that it contained from 550,000 to 700,000 feet. After the loss, and under the terms of the policy, the parties appointed three disinterested

lumbermen as arbitrators to estimate the loss. They examined the yard, counted the pile bottoms as near as they could, and obtained such information as was possible to secure. They concluded that 152 piles of lumber had been destroyed. Taking the piles at an average of 12,000 feet, they figured the yard, at its fullest capacity, would have 1,800,000 feet. The evidence of plaintiffs tends to show that the yard would hold more piles of lumber than the arbitrators figured upon, and the yard was fairly full of lumber. The whole testimony left this matter upon fairly debatable ground, and, except for the almost conclusive testimony upon the other branches of the case, we should hesitate to disturb the verdict. There are, however, very many suspicious circumstances attending this branch of the case. *Henry's* statement before the board of review might be reconciled with the chronic habit of taxpayers to attempt to dodge taxation. But it seems hardly credible that the firm, desirous of selling their stock and securing purchasers therefor, should list it at less than one fourth the quantity it contained. The testimony of the arbitrators, while not conclusive, has a strong tendency to support the defendants' contention. A review of the whole evidence convinces us that the verdict is inconsistent and contrary to the great weight of the evidence and against all the reasonable probabilities in the case.

5. During the argument of the case to the jury plaintiffs' counsel, Mr. Hogan, referred several times to matters not in evidence, which had a tendency to inflame the minds of the jury against the defendants. Upon objection being made, counsel admitted his error and withdrew his remarks, and the court admonished the jury not to consider them. We refer to these matters only to suggest that counsel traveled very near the danger line, and that frequent or continued lapses of this kind, in a close case, might render it necessary to reverse the case, although the jury were directed

to disregard them. *Brown v. Swineford*, 44 Wis. 282; *Rudiger v. C., St. P., M. & O. R. Co.* 101 Wis. 292.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial. In taxing costs the clerk will exclude so much of the printed case as relates to, and is properly taxable upon, the appeal of the George E. Foster Lumber Company.