ANDREWS, Respondent, vs. UNITED STATES CASUALTY COMPANY, Appellant.

*May 2—May 31, 1913.*

*Accident insurance: Ambiguity in policy: Construction: Homicidal death: Evidence: Competency: Res gestæ: Admissibility for single purpose: Instructions to jury: "Intemperate habits:" Trial: Arguments: Improper remarks by counsel: Appeal: Reversal of judgment.*

1. Ambiguous language in an insurance policy should be construed somewhat strictly against the insurer, and of two reasonable meanings which are fairly balanced, the one supporting rather than the one defeating liability should be taken.
2. A policy of casualty insurance which provided for liability in case of death caused "solely through external, violent, and accidental means," expressly excepted "intentional self-inflicted injury" and "loss or injury resulting from . . . any means or act which if used or done by the insured while in possession of all mental faculties would be deemed intentional or self-inflicted." *Held,* that the exception did not cover homicidal death.
3. Statements made by the assured and his companion immediately after the shooting from the effects of which he died, when others first came upon the scene, were so closely connected with the occurrence as to be within the field of *res gestæ.*

4. But statements made by the assured, after he had been removed from the place where he was shot and while he was under treatment for his injury, tending to show that the shooting was homicidal in character, were not a part of the *res gestæ* and their admission was error.

5. The issue being as to whether the death of the assured was homicidal or self-inflicted, evidence that, two years before, his mistress, who was the author of his death if it was homicidal, admitted that she had tried to kill him and that later she threatened to do it on two occasions when they quarreled,— no connection being shown between such events and the one under investigation,—was incompetent and its admission was prejudicial error.

6. Evidence of a telephone conversation with the mistress of the assured, while he was in the hospital; wherein she admitted having done the shooting, was admissible for the purpose of discrediting her testimony to the contrary, but should have been carefully limited by the court, in instructions to the jury, to such legitimate purpose.

7. Upon an issue as to whether the assured in a casualty policy was of "intemperate habits" in respect to the use of intoxicating liquors, it was error to so define this term in the charge to the jury as to impress upon them the idea of *regularity* of indulgence,—the plain meaning being that the excessive use of intoxicants has become a usual, customary characteristic of a man.

8. Highly improper remarks of plaintiff's counsel, denunciatory of defendant insurance company, persisted in despite the court's ruling that they were improper, are *held* so prejudicial as to be, of themselves, ground for reversal of a judgment in favor of the plaintiff.

APPEAL from a judgment of the circuit court for Brown county: S. D. HASTINGS, Circuit Judge. *Reversed.*

Action on a policy of casualty insurance.

In case of death liability was conditioned upon the same being caused "solely through external, violent and accidental means,"—"intentional self-inflicted injury," and "loss or injury resulting from or contributed to, directly or indirectly, wholly or partly, by disease" or "from any means or act which if used or done by the assured while in possession of all mental faculties would be deemed intentional or self-inflicted,"—

being expressly excepted, and it being stipulated that any untrue statement made in the schedule of statements upon which the policy was based would render it void. Among such statements was one to the effect that at the time of the application the assured was "free from any intemperate habit." The deceased came to his death from a bullet wound inflicted while he and one Cora Edwards, his mistress, were alone together in her room in a house of ill-repute kept by her. Two shots were fired, only one taking effect. She claimed, immediately after the occurrence, that she did the deed. Later, and upon the trial, she claimed that he shot himself. He said, immediately after the shooting, that she did it and later made a conflicting statement. There was evidence tending to show that he was much addicted to the use of intoxicants for a considerable period immediately prior to taking out the policy. The jury found that the shooting was by Cora Edwards, and that the assured died from an injury intentionally inflicted by her.

For the appellant there were briefs by *Jeffris, Mouat, Oestreich & Avery,* and oral argument by *O. E. Oestreich.* They contended, *inter alia,* that the policy excepted cases of homicide as well as suicide. *Cady v. Fidelity & C. Co.* 134 Wis. 322, 113 N. W. 967; *Berger v. Pacific M. L. Ins. Co.* 88 Fed. 241; *Corley v. Travelers' P. Asso.* 105 Fed. 854; *Marceau v. Travelers' Ins. Co.* 101 Cal. 338, 35 Pac. 856, 36 Pac. 813; *Phœnix A. & S. B. Asso. v. Stiver,* 42 Ind. App. 636, 84 N. E. 772; *Northwestern Ben. Soc. v. Dudley,* 27 Ind. App. 327, 61 N. E. 207; *Butero v. Travelers' Acc. Ins. Co.* 96 Wis. 536, 71 N. W. 811; *Cotter v. Royal Neighbors,* 76 Minn. 518, 79 N. W. 542. The charge as to "intemperate habits" was erroneous. *Mowry v. Home L. Ins. Co.* 9 R. I. 346, 355; *Zeigler v. Comm.* (Pa.) 14 Atl. 237; *Elkin v. Buschner* (Pa.) 16 Atl. 102; *Tatum v. State,* 63 Ala. 147; *Smith v. State,* 55 Ala. 1; *Magahay v. Magahay,* 35 Mich. 210. The improper remarks of counsel were alone ground for reversal. *Sullivan*

*v. C., R. I. & P. R. Co.* 119 Iowa, 464, 93 N. W. 367; *Jung v. Theo. Hamm B. Co.* 95 Minn. 367, 104 N. W. 233; *Thompson v. Bernays,* 85 Mo. App. 575; *Bjoraker v. C., M. & St. P. R. Co.* 103 Minn. 400, 115 N. W. 202, and cases cited; *Cunningham v. Bradford A. & T. Asso.* 84 Vt. 35, 77 Atl. 913; *Weinstein v. Asinof,* 113 N. Y. Supp. 996.

For the respondent there was a brief by *Martin, Martin & Martin,* and oral argument by *J. F. Martin.*

MARSHALL, J.   The proposition of first importance presented by appellant's counsel, is that the court erred in not granting judgment of no cause of action, because intentional shooting of an assured by another is within the exceptions to liability mentioned in the policy.

The question thus raised turns on the construction of the policy.   The language of it is quite peculiar and, manifestly, ambiguous.   The words "intentional self-inflicted" are plain. They were clearly intended to cover a case of suicide while sane.   Instead of the term often used to cover self-destruction under any circumstances, such as "death by his own hand, sane or insane," so as to cover all cases of suicide, we find the quoted words followed by "or injury resulting from . . . any means or act which if used or done by the insured while in possession of all mental faculties would be deemed intentional or self-inflicted."

It may be admitted that such language might reasonably be regarded as intended to cover homicidal death, and to avoid the effect of the rule that such events are within the meaning of "accidental" as used in the policy.   But it is quite as reasonable construction of the words to regard them as merely intended to cover cases of self-inflicted injuries while insane and the whole together another way of phrasing an exception from liability in case of self-inflicted injury or suicide, sane or insane.

It is a cardinal rule in solving ambiguity of the sort under consideration, that the language should be construed somewhat strictly against the assurer, and that, of two reasonable meanings which are fairly balanced, the one supporting rather than the one defeating liability, should be taken. It seems that, guided by that rule, the clause in question was not intended to cover homicide, but was intended to cover suicide while insane.

The case, at the best for respondent, was exceedingly close on the question of whether the death was by suicide or by homicide. The evidence was so strong in favor of the former that, any substantial error bearing on the subject unfavorably to appellant, where the burden rested to establish the theory of suicide, could hardly have been otherwise than so prejudicial that, had it not occurred, the verdict might probably have been that the deed was caused by Ebeling himself, bringing the case within the rule as regards harmful error requiring a reversal in the interests of justice. *Oborn v. State,* 143 Wis. 249, 280, 126 N. W. 737. Therefore, some assignments of error presented for consideration as to rulings on evidence, are clearly vital to the judgment.

Complaints are made because testimony was permitted of what was said by Ebeling and Cora Edwards, immediately after the shooting, when others came upon the scene. We will pass such complaints by merely remarking that they relate to matters so closely connected with the occurrence of the homicide or suicide, whichever it was, as to spring from it directly and spontaneously, as it were, and be characterized thereby and rendered matters of *res gestæ*. It is only things which immediately or so nearly arise out of the main fact as to be, to some extent, environed in and illustrate it, which are within the field of *res gestæ*.

What has been said emphatically condemns the ruling of the trial court in permitting evidence from several witnesses

of the statements made by Ebeling, after he was removed from the scene of the occurrence, respecting the cause of his death, tending to show that it was produced by homicidal means, Cora Edwards being the guilty party. All such statements made after such removal and while Ebeling was under treatment for his injury, were clearly outside the field of *res gestæ* and in the field of self-serving declarations. The testimony came, in part, from witnesses of such character that it may very likely have had controlling weight with the jury, under the circumstances. There is no need to discuss such evidence in detail. There was considerable of it,—some relating to statements made some time after the excitement of the shooting was all over and the wounded man was in the hospital. None of it was safely *res gestæ,* except evidence of the statements made at the scene of the shooting.

Evidence was permitted that, some two years before the occurrence, Cora Edwards admitted to have tried to take Ebeling's life by shooting, and threatened to do it later, and that, shortly thereafter, she repeated such statements on an occasion of having a quarrel with him. There was no possible connection shown between such events, if they occurred, and the one under investigation. No reason is perceived why the evidence was permissible, while its prejudicial character is quite apparent.

Complaint is made because the court permitted evidence to be given of a telephone conversation with Cora Edwards while Ebeling was in the hospital, in which she was said to have admitted having done the shooting. Clearly, if that were proper at all, it was for the purpose of discrediting the evidence of the Edwards woman as regards Ebeling having shot himself. Counsel for respondent seem to have appreciated that and presented it regularly. It was a matter of great difficulty, under the circumstances, to use that evidence for a legitimate purpose and prevent it from having an ille-

gitimate effect. Whether the former was accomplished without the latter occurring is not entirely clear. We will pass the subject with what has been said, which may have a sufficient cautionary effect to prevent error in respect to the matter upon another trial. Evidence of such character might well be very carefully fenced about by the court in instructions to the jury, restricting it, definitely, to its narrow field of legitimacy. It would be very difficult, even then, to prevent it from having some prejudicial improper effect on the main question.

One of the principal questions litigated was whether Ebeling, at the time he took out the policy, was free from any intemperate habit. That was submitted to the jury in this way: "At the time of making the application for insurance, was William T. Ebeling free from all intemperate habits, in respect to the use of intoxicating liquor?" An answer in the affirmative was given. A contrary answer would have resulted in a judgment for appellant. There was much evidence tending to show that Ebeling for a long time prior to the issuance of the policy had been addicted to the use of intoxicating liquor, to excess,—certainly enough evidence to have supported an answer to the question in the negative. For that reason it was important for the jury to understand the meaning of the words "intemperate habit," as applied to the use of intoxicating liquor. To that end the learned circuit judge instructed the jury thus:

"Habit is something which implies repetition with regularity, and a man may have a habit of doing something which he does constantly, hourly and daily and weekly and monthly, or only yearly, but if he does it with regularity, we speak of it as a habit. Men may, for instance, have a habit of going to Europe every summer for recreation; we correctly speak of that as a habit although he didn't go but once a year. A man may have a habit of walking from his place of resi-

dence to his place of business on a certain street in a certain way. We speak of that as a habit, because it is something that he repeats, does regularly."

Thus, it will be seen, the idea of "regularity" was iterated and reiterated, time and again, so the jury must have gotten the notion that a person may imbibe intoxicating liquors excessively, destructively, and continuously, save irregular intervals of cessation, now and then, from one cause or another, without any thought or attempt at reformation,—and still not have any intemperate habit because of not indulging excessively at regular intervals of once or twice a day, or week or month. The idea of regularity,—recurring indulgence at regular intervals,—like the going from and coming to one's home on a particular street and substantially at the same time each day or part of the day, was given to the jury with consummate definiteness so as to leave no danger of the vital element of "regularity" of drinking—regularity of excessiveness and regularity of time between indulgence—being lost sight of.

We are constrained to think a pretty plain collection of words, with "intemperate habit" as the dominant ones, was rendered rather hard for the lay mind to understand, and given such cast that, if the jury yielded their own commonsense idea thereof to the novel technical explanation given by the court, a very erroneous view prevailed. "Intemperate habit"! Are not those words very plain, nontechnical? Words which are plain to a man of ordinary intelligence, education, and experience, can rarely be much illumined by long definitions, explanations, and illustrations. "Intemperate habit"! The common conception of that, as applied to the use of intoxicants, is use thereof, commonly, to excess. No idea of regularity of interval between indulgence, or degree of excessiveness, is thought of in using the words in every-day

affairs of life, respecting the taking of intoxicants,—just that one has the appetite and has indulged it so as to become accustomed to indulge it with considerable frequency and to an apparent degree. We apprehend that if any one should speak to another of ordinary comprehension, of a third person having an intemperate habit as regards intoxicants, no explanation would be required for a full understanding of what was meant. The idea would be that the man has so often excessively indulged in intoxicating liquor that it has become his customary rather than exceptional course of conduct—that it is a usual, customary, characteristic of him. Cent. Dict.

Thus, in the case in hand, whether the indulgences were at regular or irregular intervals made no difference. The contrary idea so carefully and emphatically pressed upon the attention of the jury for their guidance must be regarded as prejudicial error.

Another error occurred on the trial of manifestly harmful character and which we could not regard otherwise than as fatal to the judgment, if there were no other such in the case. It is most unfortunate for counsel, by his own personal conduct, to inject fatal error into a case, since much of the consequences must fall on the client whose interests he is employed to conserve. The prejudice, in its pecuniary effect, in this case, is minimized by the fact that the fault is only one of several fatal matters. However, the lesson ought not to be lost of what harmful effect such an infraction as we must spread upon the record might have upon the party served by the transgressor, and which would occur directly therefrom, in this instance, except for circumstances not palliating the offense.

In addressing the jury in closing the case counsel for plaintiff referred to the appellant thus:

"The *United States Casualty Company?* The United States damnation and hell, creature of hell. *United States*

*Casualty,* hell and damnation, and behind that put devilish, malicious, fraudulent, trying to deprive this woman who is made the beneficiary in that policy of a just claim at the hand of these harlots."

Those extraordinary expressions were interspersed with exceptions by counsel for appellant and requests for the remarks to be taken down, upon which counsel for respondent said, evidently with exhibition of much feeling, to the reporter: "Take everything down, if you see fit," and then, apparently appealing to the jury, ".Isn't that true, gentlemen?"—followed by a further exception and the court sustaining it, characterizing counsel's remarks as very improper and very unprofessional. Whereupon, the counsel, instead of submitting and making some sort of an apology for what, in cooler moments, he would have been very quick to condemn in himself or any one else, excepted to the ruling of the court and insisted that his remarks were proper, and there does not seem to have been any effort on the part of the court to repress him.

If there were anything in the case to afford any excuse for counsel's language the record does not show it. It was not even a case where the attitude of defendant was of doubtful propriety from a moral, benevolent, or legal standpoint. The circumstances were such that appellant was well warranted in submitting the questions of fact involved to the judgment of a jury and the questions of law to the court. That such an occurrence could operate otherwise than harmfully, is hardly believable. Associate counsel now suggest that it was of such exceptional character that, the likelihood is that the harm, if any, was to the plaintiff rather than defendant. That is ingenious, but not at all persuasive since the verdict was for the former at all points, notwithstanding the evidence in favor of the latter might well have led to a contrary result.

Such prejudicial conduct cannot well be cured in any case merely by a judicial ruling disapproving of it, especially in the face of counsel's persistence in his course; much less where the case is such that an unprejudiced jury might, at least, as well decide in favor of the party against which the remarks were made as in his adversary's favor. There is, really, no way to efficiently remove from a case the prejudicial effect of such conduct under the peculiar circumstances which existed in this case. A mere ruling and such characterization of the remarks as occurred, would come far short of it. If even followed by cautionary remarks to the jury, the poison injected into the case would be likely to remain efficient, as said, in effect, in *Rudiger v. C., St. P., M. & O. R. Co.* 101 Wis. 292, 77 N. W. 169. This court has too often dealt with such matters to leave any doubt about the effect of such error. *Schaidler v. C. & N. W. R. Co.* 102 Wis. 564, 78 N. W. 732; *Masterson v. C. & N. W. R. Co.* 102 Wis. 571, 78 N. W. 757; *Wunderlich v. Palatine F. Ins. Co.* 104 Wis. 382, 80 N. W. 467.

It is with much regret that we are compelled to make this record. The error is assigned. The facts have to be stated. They have to be dealt with and dealt with rightly. Doubtless the eminent counsel who was so at fault, had some sort of provocation which might, at least, palliate the conduct, but which is not even suggested by anything appearing in the record. It is to his credit that no attempt is made now to justify it, and he stands for the suggestion that it was more likely than otherwise to have reacted because of its manifest unfairness. Our high regard for the eminent counsel who, in general, before this court is so helpful in the administration of justice, moves us to extend as much judicial charity as is proper while condemning as we have.

In closing on this it may well be said, that trial courts have

a very important duty to perform in such a situation as we have been called upon to deal with. It should be prevented, if possible, by a firm repressive attitude. If that be not efficient, it should be promptly, firmly, and judicially checked at the very threshold, and any spirit of insubordination to the judgment of the court on such a matter of professional conduct met so as to be punitive for the infraction and an example for the future. That is essential to the dignity of both bench and bar, to the promotion of the highest attainable standard of judicial and legal ethics, and the reputable administration of the law.

*By the Court.*—The judgment is reversed, and the cause remanded for a new trial.