Truelsch v. Miller, 186 Wis. 239.

---

TRUELSCH, Respondent, vs. MILLER, interpleaded, Appellant. [Consolidated action.]

*November 15, 1924—March 10, 1925.*

*Trustees: Embezzled money applied to payment of insurance premiums: Extension of times of payment: Rights of beneficiary: Of owner of stolen property: Married women: Resulting trusts: Tracing stolen money: Degree of proof required: Evidence: Declarations against interest: Letter of suicide to his wife: Trial: Findings of court: Weight if court mistaken as to law.*

1. Declarations of a person since deceased, when against his pecuniary or proprietary interest and concerning which he had peculiar knowledge, and where there was no probable motive to falsify the facts, may be received as substantive evidence and against third parties. p. 248.
2. Letters written by a bookkeeper shortly before he committed suicide, admitting the theft of his employer's money and the concealment thereof by false entries in the books, as well as the falsified books, were admissible in an action by the employer to impress a trust on life insurance policies of the employee. p. 248.

3. A letter from the employee to his wife, admitting the theft, and which inclosed another letter directed to a third person which contained similar statements, was not privileged, under sec. 4072, Stats.  p. 249.

4. Ordinarily, a wife acquires a vested interest in the husband's life insurance policy issued in her name which cannot be divested by mere declarations of the husband.  p. 250.

5. The intention to create a trust or the existence of a conventional trust relation are not necessary to the creation of a constructive trust by a wrongdoer.  p. 251.

6. The right to follow the embezzled money was not lost because such money was used to pay premiums on life insurance policies payable to the wife, notwithstanding sec. 2347, Stats., the wife not being an innocent purchaser.  p. 252.

7. One who has become a constructive trustee by reason of wrongfully receiving or securing the property of another cannot escape the consequences of his acts by changing the form of the property thus acquired; and as between him and the *cestui que trust* the latter may pursue the funds into the new investment and charge the same with the trust.  p. 252.

8. Statutes guarding the rights of married women in insurance policies and homesteads are liberally construed, but they are not designed to encourage fraud or to make such property a safe depository for stolen funds.  p. 252.

9. The evidence in this case is *held* sufficient to warrant a finding that the money embezzled by decedent was used to pay the premiums on his life insurance policies.  p. 257.

10. The fact that the insured sometimes gave notes for such premiums did not negative the employer's claim that the premiums were paid out of embezzled funds, the mere taking of a note by a creditor not being payment unless so agreed.  p. 259.

11. To impress a trust on the life insurance policies it was not necessary to prove the embezzlement of funds by the insured and the payment of premiums therewith beyond a reasonable doubt.  This may be done by circumstantial evidence.  p. 259.

12. The rule that one cannot follow money in equity because it has no earmarks is no longer followed.  p. 260.

13. The findings of a referee impressing a trust on life insurance policies are not to be disturbed unless clearly contrary to a preponderance of the evidence.  p. 260.

14. Where the trial court committed serious errors of law, its findings of fact were not entitled to as much weight as is usually given thereto.  p. 260.

Truelsch v. Miller, 186 Wis. 239.

15. The employer's lien on the insurance policies was not limited to the amount of the premiums paid out of the embezzled money, and the referee properly imposed a trust for two thirds of the proceeds on the policy on which two thirds of the premiums had been paid out of the embezzled funds.  p. 262.

APPEAL, from a judgment of the circuit court for Racine county: C. M. DAVISON, Judge.  *Reversed.*

Two separate actions were brought against the defendant insurance companies upon four insurance policies on the life of the plaintiff's husband.  These moneys in question were paid into court; the actions were consolidated, and the parties to these actions each claim the money, the plaintiff as the beneficiary under her husband's policies and the appellant as the owner of the money with which the deceased paid the premiums.  The following are the dates and the amounts of the policies involved:  $1,000, New England Mutual, No. 245,641, March 9, 1912; $1,000, Northwestern Mutual, No. 1,020,187, December 26, 1913; $1,500, New England Mutual, No. 276,966, May 16, 1914; $2,000, Northwestern Mutual, No. 1,144,294, March 16, 1916.

The deceased, Paul Truelsch, was employed by the appellant, *Miller,* first as a clerk and then as a bookkeeper for a period of ten years.  About noon on March 30, 1917, the son of the appellant thought that the deceased's books did not balance and suggested that he return in the afternoon and they would check them over together.  The deceased then apparently took $40 from the cash drawer, leaving a memorandum to that effect, went to the insurance office and paid the second premium on the last of the four policies, thus rendering it incontestable, and then within an hour threw himself in front of a fast-moving train near Racine, Wisconsin, and was instantly killed.  On his person was found a letter addressed to *Alice,* the name of his wife, and within that letter another addressed to the appellant's son

Walt, with whom he was to have checked over his accounts that afternoon. After some difficulty with respect to the testimony of the wife as to the contents of the letters, they were obtained and admitted in evidence and read as follows:

"Dearest *Alice:* When this gets to you, I guess I'll be gone. Please—oh, please—forgive your poor Paul. He stole $4,400 from *Miller* and can't pay the bill. God—how this hurts.—It's awful. My life insurance, $5,500, will pay, I am sure, all right. It's all paid up and all over one year old—therefore—noncontestable. They must pay in full. I owe a small bill at Kradwell's—at the L. & C. and at Ernest Johnson—that's all. The flat will take care of a $200-note due at the bank this summer and there ought to be some money left from that after it is sold.

"Get Rev. Fedders to look after you. Call up Hank— he'll help you. If you need a lawyer—get Smieding, he's honest. Give the inclosed letter to Walt and ask him to say to the papers that I was a good bookkeeper and my accounts were all in first class shape—Dave Griswold and Fowler will do that for me if it should get out.

"Oh, *Alice*—I'm so sorry—so awfully sorry—I stole the money from time to time intending to replace it and couldn't. I had saved up some money to replace part of it and then I met and married you and put it into a home instead. We've been living on my salary all right. This has nothing to do with that. I hope I won't go insane before I finish this. Good God, this is terrible. I hope you will be all right. I hope everything will go good with you after this. I should not have married you—but, oh, how I loved you—how I love you now—and how I hate to do this. It will hurt you terribly. It's the only thing I can do—I can't face the *Millers,* and this way the insurance companies will have to make it good. They must. You must insist on it. That will leave you only a little to live on, *Alice.* Don't let Mrs. Held neglect you, dearest. I wish we could have lived our lives out. But it's too late. Don't hate me too much, *Alice.* "Please don't hate me, *Alice.* Say good-by to mother and everybody. I loved you and her—oh, so hard, this is too bad—it may break her heart, but you bear up under it all.

"Good-bye—dearest wife—dearest—dearest wife. I love you—don't hate me.                              PAUL."

Truelsch v. Miller, 186 Wis. 239.

"Walt: I am a straight $4,000 short on the books and the bank account is $400 short. I stole it from time to time meaning to replace it but couldn't. The money I spent for my own home and wife was all my own—I should have used it to pay you back but loved *Alice* too much and hoped I could make good.

"Walt—my dying wish is that you let my name stay clear to the world—please do it. Tell them I was all right and good and my accounts were in perfect shape and you could see no reason for my taking my life. My life insurance, $5,500, will pay it up. Kind of look after *Alice* for me, please—oh, please do this and forgive me. I paid for it.

"PAUL."

"Walt: Don't blame *Alice*—she knew nothing of it and she didn't get a cent of it. I just took a little at a time for nine years and spent it here and there. My—Lord—how it counted up. It is awful. Good-by, Walt; don't let the world know—tell them I was all right."

When the appellant heard of these circumstances he had one Dawson, a chartered public accountant, go over the books of the company which had been kept by Paul Truelsch and make a report on them. The report indicated that between January 1, 1914, when the books were found to balance, and the date of Paul's death, the books showed shortages amounting in all to $4,000, and that the cash in the bank was short $400. The shortages were for various amounts from $1,000 to $50 and were covered up in the first instances by increasing the miscellaneous bills receivable and later by decreasing the miscellaneous bills payable, and during the period just preceding his death Paul covered the shortages by so manipulating the adding machine that certain figures in a column of figures would not be included in the sum total registered at the bottom of the column. Dawson did not attempt to show when and in what amounts the money was taken. The son of the appellant, however, made a chart showing the dates of the payments of the premiums and the notes given for premiums and the dates when sums were dropped from the books, together with a

record of the checks drawn by the deceased for the payment of such premiums and notes, and this chart was introduced in evidence. The amount of seventy-three dollars and some cents was added to the claim of the appellant by the addition of the $40 taken just before the deceased's death and for certain other items claimed to have been abstracted.

The plaintiff wife, though apparently falsifying in certain statements, seems to have been unaware as to the fraudulent conduct of her husband. She stated that he usually gave her the salary received from the appellant, *Miller,* and that she ordinarily paid the household bills though sometimes he would do so. She stated that he did not always give her the amount of his salary at once, although the books of the company always show the payment to have been made in cash on the last or next to the last day of the month. Although asserting that she sometimes wrote the checks for the insurance premiums, she did not offer any checks in evidence nor any report of the bank statements.

There is some dispute as to the question whether the deceased had any source of income other than his salary. It was stated that twenty or thirty dollars a month was obtained from a flat and that he made certain other moneys in developing pictures, though no testimony is given as to the amount and it would seem to be negligible. He was stated to have been accustomed to do certain odd jobs, but no testimony as to any definite amount of money is given, and the referee found that no income other than the salary was established. The principal issue with regard to the facts is whether there is evidence which will justify the finding that the money was taken and used in the payment of the insurance premiums. The plaintiff's counsel insist that the embezzlement has not been established, as the books merely indicate shortages and in at least one instance an overage. Counsel for the appellant claim that the embezzlement is practically demonstrated. The only case in which

this is established by direct evidence is in the case of the premium paid within an hour of the death of the deceased. In other instances the result must depend on the kind of evidence referred to in the opinion.

The referee found that from January 1, 1914, to March 30, 1917, Paul Truelsch was paid a salary of $3,195, and during that period unlawfully took and embezzled from his employer the sum of $4,477.73; that after the 1st of January, 1914, all of the premiums on the policies were maintained and paid by the moneys so misappropriated; that the embezzlement was concealed by false entries and fraudulent manipulation of an adding machine; that the letters above set forth were delivered to the plaintiff March 30, 1917, and that with full notice of their contents she made proof of death and brought suits to recover the amounts due and at all times refused to carry out the instructions of the deceased or to recognize any lien in favor of the appellant.

As conclusions of law it was found that a trust was impressed in favor of the appellant upon two thirds of the policy of $1,000 of the New England Mutual Insurance Company and that the remainder of the policy was owned by the plaintiff; that all other policies and the proceeds were impressed with a trust in favor of the appellant, *Miller,* for the amounts misappropriated and used. The amount of said misappropriation was determined to be $4,477.73.

When the defendant asked for confirmation in the circuit court, the referee's findings, holding that the letters found on the deceased and the books of the company were evidence as against the plaintiff, were reversed, and the circuit court held that there was not sufficient evidence upon which to base the finding that the money of the defendant *Miller* was employed to pay for the premiums on the policies, with the exception of the premium paid on the day of Paul's death. The circuit court held that the money paid into court by the insurance companies was the property of the plaintiff,

and from this judgment the defendant *Miller* appeals on the grounds that the referee's findings were improperly set aside and that these findings entitle the defendant to judgment.

A schedule, which will be referred to in the opinion, is here included (see page 247), showing in concise form the shortages and a history of the payments made on the several policies and other data. Further facts will be stated in the opinion.

For the appellant there was a brief by *Simmons, Walker & Wratten* of Racine, and oral argument by *John B. Simmons* and *Charles F. Wratten.*

For the respondent there was a brief by *Thompson, Myers & Helm* of Racine, and oral argument by *W. D. Thompson.*

The following opinion was filed January 13, 1925:

Jones, J.  The views of the referee and the trial judge as to the legal questions involved present a striking contrast. The trial court held that Paul was a mere employee and in no sense a trustee; that the letters and books of the company offered were mere hearsay; that the title to the policies became at once vested in the plaintiff under the statutes and could not be divested except by surrender and indorsement.

In treating the letters as pure hearsay the court disregarded an important exception to the rule excluding hearsay evidence which has long been recognized as well settled. In his work on Evidence Mr. Wigmore traces the history of the exception and shows that it had its origin more than a century ago. Secs. 1456, 1476. The exception is that the declarations of persons, since deceased, are admissible in evidence provided the declarant had peculiar means of knowing the matter stated, if he had no interest to misrepresent it, and if it was opposed to his pecuniary or proprietary interest. Such declarations are not received as admissions, nor as entries made in the ordinary course of business,

Truelsch v. Miller, 186 Wis. 239.

New England Policy No. 245641, $1,000.   Dated March 9, 1912.

| Amt. Paid. | How Paid. | Date When Paid. | Date of Deposit Where Paid by Check. | Date of Shortage Shown. | Amt. of Short age. |
|---|---|---|---|---|---|
| $5.90 | Cash | Apr. 1, 1912. | | Mar. 19 to Apr. 4 ............. | $88.89 |
| 5.08 | Check | June 10, 1912. | June 8, 1912. | June 6 to June 8 ............. | 150.00 |
| 4.22 | Check | Sept. 10, 1912. | Sept. 7, 1912. | August 31 dropped $280 in footing. | |
| 6 00 | Check | Apr. 12, 1913. | Apr. 4, 1913. | Apr. 1 to Apr. 4 ............. | 461.55 |
| 4.18 | Check | Jan. 15, 1913. | Jan. 3, 1913. | Jan. 2-8, 1913 ............. | 351.55 |
| 3.90 | Check | June 4, 1913. | June 2, 1913. | May 29 to May 31 ........... | 51.90 |
| 9.27 | Check | Oct. 3, 1913. | Oct. 2, 1913. | Sept. 29 to Sept. 30.......... | 50 00 |
| 18.90 | Check | Apr. 9, 1914. | Apr. 9, 1914. | Dropped $800 in footing Apr. 6, 1914, to April 11. | 46.55 |
| 1.30 | Check | Apr. 12, 1915. | Apr. 2, 1915. | Apr. 28 dropped $1,000. Apr. 1 to Apr. 7.............. | 303.20 |
| 5.08 | Check | July 7, 1915. | July 2 and 7, 1915. | June 30 to July 8............. | 27.22 |
| 5 15 | Check | Oct. 8, 1915. | Oct. 5 and 8, 1915. | Oct. 1 to Oct. 8 ............. | 23.44 |
| 4 18 | Check | Jan. 8, 1916. | Dec. 23 and 27. | Dec. 23 to 24 ............... | 232.25 |
| 1.20 | Check | Feb. 17, 1916. | Feb. 2, 5, 15, 16, 1916. | Feb. 1, 1916................... | 290.00 |
| | | | | Feb. 12-14................... | 242.13 |
| | | | | Mar. 13 dropped $400. | |
| 5.00 | Cash | July 10, 1916. | | July 1 to July 5............. | 393.00 |
| 5.15 | Check | Oct. 10, 1916. | Oct. 3 and 9, 1916. | Oct. 2 to Oct. 4............. | 160.00 |
| | | | | Oct. 26 dropped $150. | |
| 4 18 | Check | Jan. 11, 1917. | Jan. 8 and 11, 1917. | Jan. 6 to Jan. 12............. | 251.50 |
| 1.05 | Check | Mar. 22, 1917. | Mar. 16, 1917. | Mar. 10 to 15 ............... | 50 00 |
| $88.44 | | | | | |

Northwestern Mutual Life Policy No. 1020187, $1,000.   Dated December 26, 1913.

| Amt. Paid. | How Paid. | Date When Paid. | Date of Deposit Where Paid by Check. | Date of Shortage Shown. | Amt. of Short age. |
|---|---|---|---|---|---|
| $19.00 | Check | Feb. 17, 1914. | Feb. 13, 17, 1914. | Feb. 6-21, 1914............... | $74.10 |
| 10 00 | Cash | Jan. 26, 1915. | | | |
| 5.24 | Check | Mar. 4, 1915. | Feb. 20, 23, 1915. | Feb. 18-20, 1915............... | 2.24 |
| 15.12 | Check | Feb. 5, 1916. | Feb. 2, 5, 1916. | Feb. 4-5, 1916............... | 100.00 |
| 14.99 | Cash | Jan. 31, 1917. | | Jan. 30 to Feb. 2............ | 41 20 |
| $64.35 | | | | | |

Northwestern Mutual Life Policy No. 1144294, $2,000.   Dated March 16, 1916.

| Amt. Paid. | How Paid. | Date When Paid. | Date of Deposit Where Paid by Check. | Date of Shortage Shown. | Amt. of Short age. |
|---|---|---|---|---|---|
| $41.96 | Cash | May 15, 1916. | | May 15, 1916 ................. | $540.00 |
| 33.28 | Cash | Mar. 30, 1917. | | Mar. 30, 1917 ................. | 40.00 |
| $75 24 | | | | | $580 00 |

New England Policy No. 276986, $1,500.   Dated May 16, 1914.

| Amt. Paid. | How Paid. | Date When Paid. | Date of Deposit Where Paid by Check. | Date of Shortage Shown. | Amt. of Short age. |
|---|---|---|---|---|---|
| $00.30 | Cash | June 13, 1914. | | June 5 dropped $500 in footings. | |
| 7 85 | Check | July 17, 1914. | July 17, 1914. | July 15-17, 1914............... | $375.00 |
| | | | | July 15 dropped $350. | |
| 8.12 | Check | Aug. 20, 1914. | Aug. 18, 20, 1914. | Aug. 15-20, 1914 ............. | 27.40 |
| | | | | Aug. 4, 26, 31, $500 dropped in footing. | |
| 7.21 | Check | Nov. 17, 1914. | Nov. 12, 16, 1914. | Nov. 9, 1914 ................. | 50.00 |
| | | | | Oct. 17 dropped $50 and Nov. 30 dropped $100 in footing. | |
| 7.32 | Check | Feb. 16, 1915. | Feb. 18, 1915. | June 8-16, 1915................ | |
| 3.75 | Cash | June 16, 1915. | | | 13 75 |
| 7.11 | Check | Sept. 18, 1915. | Sept. 11, 18, 1915. | Sept. 3-4................. | 22.30 |
| 7.21 | Check | Dec. 16, 1915. | Dec. 11, 16, 1915. | Dec. 11-15.. ................. | 249.97 |
| 7.32 | Check | Mar. 16. | Feb. 23 and Mar. 16, 1916. | Mar. 9, 10. ................. | 10.56 |
| 3.60 | Check | May 16, 1916. | May 12, 1916. | May 11-13, 1916............... | 11 20 |
| 7.11 | Check | Sept. 16, 1916. | Sept. 15, 16, 1916. | Sept. 14, 15, 1916............. | 412 00 |
| | | | | July 28 dropped $350. | |
| 7 21 | Check | Dec. 18, 1916. | Dec. 18, 1916. | Dec. 15, 16, 1916..... ........ | 48 22 |
| 7.32 | Check | Mar. 20, 1917. | Mar. 17, 1917. | Mar. 10-13, 1917............. | 50 00 |
| $73.81 | | | | | |

nor on the ground that any privity exists between the declarant and the person against whom they are offered. When it appears that the declarant is dead, that the statement was against his pecuniary or proprietary interest, of a fact of which he was personally cognizant and there was no probable motive to falsify the facts, the declaration may be received as substantive evidence and against third parties.

The reason for the exception is thus stated in 1 Greenleaf on Evidence, § 148:

"The ground upon which this evidence is received is the extreme improbability of its falsehood. The regard which men usually pay to their own interest is deemed a sufficient security, both that the declarations were not made under any mistake of fact, or want of information on the part of the declarant, if he had the requisite means of knowledge, and that the matter declared is true."

The fact that the statements are not admissible during the life of the declarant and that such declarations are sometimes the only mode of proof available are regarded as additional reasons for the reception of such statements in evidence without the sanction of an oath by the declarant. Mr. Wigmore vigorously argues that the exception should be so extended as to include confessions of crime or other statements of facts against penal interest. See § 1476. But, as he concedes, this view has not been generally accepted. 4 Chamberlayne, Evidence, § 2779, and cases cited.

The letters in this case are plainly within the class of declarations contemplated by the exception under discussion and should not have been disregarded. The testimony showed and the referee found that Paul was the confidential clerk and bookkeeper of the defendant and was intrusted with the collection, custody, handling, and depositing in the bank of moneys belonging to the business as well as keeping the accounts. Entries by Paul on the debit side of the account were declarations by him that he had received the

sums specified and were acknowledgments by him of the receipts, payments, and balances. This exception to the general rule excluding hearsay evidence is so well settled as to call for no elaborate discussion. We only cite some of the many authorities in which the subject is discussed and in which many cases are cited. 3 Wigmore, Evidence, §§ 1455–1476; 4 Chamberlayne, Evidence, §§ 2770–2789; 1 Elliott, Evidence, §§ 434, 436, 439, and 441; 1 Greenleaf, Evidence, §§ 147, 148; 4 Ency. of Evidence, p. 87.

There is careful argument in appellant's brief of the proposition that the letters were not confidential communications between husband and wife within the meaning of sec. 4072, Stats. 1917. We consider the proposition sound for several reasons. They were not private communications made and completed during marriage. The letter addressed to the plaintiff contained another communication, which she was directed to deliver to a third person, and which repeated the most essential facts to which objection might be made. It is plain that, in order to carry out the instructions in the letters, their substance would have to be communicated to others. That this letter addressed to Walt was not privileged is too plain for argument. Counsel for the respondent do not contend that either letter was privileged under the statute, and we shall not extend the discussion of the subject. We only cite a few of the many authorities referred to in the appellant's brief. *Whitford v. North State L. Ins. Co.* 163 N. C. 223, 79 S. E. 501; *Barras v. Barras,* 192 Mich. 584, 159 N. W. 147; 28 Ruling Case Law, p. 530, § 119; 1 Greenleaf, Evidence, § 254; 40 Cyc. 2358.

Although counsel for the plaintiff do not argue that the letters were confidential and therefore privileged communications, they do strenuously insist, and it was held by the trial court, that they were no part of the *res gestæ* and were irrelevant and incompetent as against the beneficiary. Counsel rely on sec. 2347 of the Statutes, according to which poli-

cies payable to a married woman are her sole and separate property, free from the control, disposition, or claims of her husband and from the claims of his representatives. It is argued that under this statute the title of the plaintiff vested when the policies were issued in her name and that it could not be divested except by surrender of the policies and indorsement by the insurance companies of a change of beneficiary. Following this line of argument, numerous cases are cited holding that declarations by the insured, inconsistent with those made in the application for insurance and not part of the *res gestæ,* are inadmissible. To this proposition the following cases are cited: *Rawson v. Milwaukee Mut. L. Ins. Co.* 115 Wis. 641, 92 N. W. 378; *Johnson v. Fraternal Reserve Asso.* 136 Wis. 528, 117 N. W. 1019; *Andrews v. U. S. C. Co.* 154 Wis. 82, 142 N. W. 487; *Maine v. Maryland C. Co.* 172 Wis. 350, 178 N. W. 749. These cases hold in substance that a beneficiary has so far a vested interest in a policy of insurance that declarations of the assured are not admissible to prove false statements in the application unless they are made at or about the time of the application and are so closely connected with it as to be part of the *res gestæ.* But if there is independent proof of the falsity of the application, declarations of the assured may be received, but only to show his knowledge that the statements in the application were false. But in our opinion these cases do not meet the situation here presented. It may be conceded that ordinarily a wife acquires a vested interest in a policy of insurance issued in her name which cannot be divested by mere declarations of her husband. It is doubtless true as claimed by the plaintiff's counsel that the letters in question did not effect a transfer of the plaintiff's title or control the disposition of the funds. They were offered for no such purpose, but as tending to show that whatever interest she acquired was burdened with a trust,

because, as claimed, the premiums were paid by moneys stolen from the appellant. This subject will be further discussed in this opinion.

In his decision the trial judge said: "Truelsch had the confidence of his employer, but he was a mere employee and not a trustee within the strict definition of equity." It may be inferred from this statement that the court was of the opinion that it was a condition of recovery on the part of the appellant that he must prove the existence of a conventional or technical trust. If that view was entertained, it is of course impossible to say to what extent it influenced the determination by the court of the other questions. The duties of Paul Truelsch have been already stated, and it is plain from all the evidence that the appellant reposed in him the utmost confidence. We do not regard it as very important in this case whether his relation to his employer be described as employee, agent, or trustee. If during the performance of such duties as were intrusted to him he stole or embezzled the funds of his employer and an equitable remedy were necessary to right the wrong and reach the funds or property into which they might pass, there existed a constructive trust, which a court of equity might enforce against the wrongdoer if he were living. The rule applies in cases where property is stolen or embezzled, although it is most often invoked to prevent the success of fraud in the myriad forms which it assumes. When necessary, the courts thrust the trust on the wrongdoer without regard to whether there was an intention by the parties to create a trust and in the absence of a technical or conventional trust relation.

It seems to have been the opinion in the trial court that the general rule had no application here because the title to the policies vested in the plaintiff and became her sole and separate property free from any trust or incumbrance by

virtue of sec. 2347 of the Statutes.   It would be a signal failure of justice if one who has become a constructive trustee by reason of wrongfully receiving or securing the property of 'another could escape the consequences of his acts by changing the form of the property thus acquired. Hence, as between him and the *cestui que trust,* the latter may pursue the funds into the new investment and charge that investment with the trust.   He may also assert and enforce the same right against third parties to whom the property has been transferred with knowledge of the trust or who have paid no consideration for it, provided the identity of the trust fund can be established.   In this case, if the premiums were paid from funds stolen or embezzled from the appellant, each policy became impressed with a trust in the appellant's favor the instant each premium was paid.   The referee found, as we believe on satisfactory evidence, that none of the premiums were paid by the plaintiff. She was not an innocent purchaser.   The statutes guarding the rights of married women in insurance policies and homesteads are beneficent statutes, which are liberally construed in their behalf.   But they are not designed to encourage fraud or to make such property a safe depository for stolen funds.   The following are some of the authorities sustaining the right of the *cestui que trust* to follow funds when misappropriated: 3 Pomeroy, Eq. Jur. § 1051; 26 Ruling Case Law, pp. 1350, 1351; *Holmes v. Gilman,* 138 N. Y. 369, 34 N. E. 205; *Shaler v. Trowbridge,* 28 N. J. Eq. 595; *Bromley v. C., C., C. & St. L. R. Co.* 103 Wis. 562, 79 N. W. 741; *Nebraska Nat. Bank v. Johnson,* 51 Neb. 546, 71 N. W. 294.

The respondent's counsel argue that there was no constructive trust impressed on the policies because, as they claim, none of the appellant's moneys were used in procuring or maintaining the policies, and the trial court so found except as to $33.28 used in paying a premium of the

Northwestern Mutual Life Insurance Company policy on the day of the death of Paul Truelsch. Dawson, the chartered accountant who first made an examination to ascertain if there were any discrepancies in the books kept by Truelsch, was examined and cross-examined at great length, and from his evidence it appears that he was thoroughly competent for the work. During this investigation he examined the books of the appellant, all in the handwriting of the deceased, the records of the bank showing bank dealings with both the appellant and Truelsch, including checks, bank statements, and a great number of exhibits. It is neither necessary nor desirable to include in this opinion the details of the method by which the accountant showed from the voluminous records and documents that the deceased had misappropriated the amounts found by the referee. If the deceased appropriated the appellant's money intending to defraud him, it was necessary, in order to escape discovery, to adopt some plan of falsifying the books. The plan which had been adopted and was carried on from April, 1914, to the following November was to conceal the shortages on the trial balances by increasing the miscellaneous bills receivable. After that date correct balances would be shown from bills receivable and the shortage concealed by decreasing the amount of the miscellaneous bills payable by the amount of the shortage. At a later period the plan adopted to conceal the shortages was that of manipulating the adding machine in such a manner as to present false footings. The books of the appellant are here as part of the record, and an examination of them shows that in the instances pointed out by the accountant the footings are false. In the numerous instances of this kind this could hardly be the result of mistake, since if the cash were correctly counted the mistake would appear at once in the failure of the books to balance.

The following were the shortages disclosed by the exami-

nation of the chartered accountant and which were explained by him in great detail:

| | |
|---|---:|
| April 30, 1914 | $1,000 |
| June 5, 1914 | 500 |
| July 18, 1914 | 350 |
| August 4, 1914 | 320 |
| August 25, 1914 | 80 |
| August 31, 1914 | 100 |
| October 7, 1914 | 50 |
| November 30, 1914 | 100 |
| August 10, 1915 | 500 |
| September 3, 1915 | 100 |
| March 13, 1916 | 400 |
| July 28, 1916 | 350 |
| October 26, 1916 | 150 |
| March 30, 1917 | 400 |
| | $4,400 |

The testimony is that all the methods above described are not uncommonly used by those who attempt to falsify book accounts; that although the methods are somewhat crude they may be carried on without discovery, especially where great confidence is reposed in the bookkeeper. According to the testimony the shortages were created through operations on the cash drawer before the moneys got into the bank. Dawson testified that it would be too much trouble for him to go into the details of the daily transactions between the dates above mentioned to see how the shortages were concealed between the dates in the list above set forth. Nor did he undertake to discover when the moneys were stolen. He only established the shortages, leaving the details for future consideration. He stated, however, that it would be possible to ascertain approximately the date when any money was taken out by taking each day's receipts and disbursements and verifying the cash in hand and the bank balance, but that it would entail much labor. This labor

was later undertaken by Walton Miller, who from the various books and exhibits in evidence prepared an elaborate statement consisting of many pages in the printed case, giving a record of each policy, the amounts of premiums paid, and when and how these payments were made, the dates and amounts of deposits in Paul's bank books, and a summary of the deposits, checks, and balances as shown in the books of the appellant kept by Paul. It appears from the testimony that it was the habit of the deceased to increase the amount stated to be in the bank by the amount of the shortage in the cash in the cash drawer, with the result that the total footing would balance. This method was the one used to cover up the shortage of $400 in the bank at the time of the death of Paul, as testified to by Dawson, who further testified that it was a common method of covering up such shortages from day to day until the amount was dropped from the books.

Another chart was prepared by Wratten from the exhibits offered in evidence, giving in more condensed form a history of the different policies and the premiums and the times and modes of payment. These statements and charts prepared by Walton Miller and Wratten were sworn to be correct, and the statement prepared by Walton Miller was submitted to respondent's counsel before the hearing and was not challenged. The investigation by Walton Miller was not confined to the period covered by the chartered accountant, but commenced on March 19, 1912. For convenience counsel for appellant have printed in their brief a schedule showing in more compact form some of the particulars as to the amounts of premiums, the times and mode of payment, and the dates of shortages. This statement has been given in the statement of facts. Its correctness does not seem to have been questioned by the respondent's counsel. The referee had the opportunity of examining in detail the statements and exhibits used in the trial and of hearing the testi-

mony of witnesses in relation to them. It is a reasonable conclusion from all the evidence that the amounts described as shortages were not taken by Paul in large amounts, but that he abstracted small sums before the money went into the bank, and at such times as he thought most safe falsified the books to cover the amounts. He kept a small bank account in which the balances shown were very small, often only a few cents and never exceeding nineteen dollars. If there was a systematic scheme to defraud his employer, such a course was safer than to keep a large bank account which if discovered might lead to suspicion. The books, exhibits, and statements used at the trial would probably not alone afford sufficient proof that moneys embezzled were used to pay the premiums. They do show that there was a systematic course of misappropriation of money of the employer, which was continued throughout the period included in the report of the referee; and they show such proximity between the times of embezzlement and the payment of the premium as affords circumstantial evidence tending to prove the facts claimed by the appellant. But the referee did not rely alone on the documentary evidence of the kind now under discussion. The letters and the other documentary evidence show beyond any reasonable doubt the defalcations found by the referee. In determining whether those funds were used in procuring or maintaining the policies, it was proper to consider the other sources of Paul's income, if any he had. These were carefully investigated by the referee and he concluded that there were only two sources of income, to wit, the salary and the embezzled funds. Paul turned over his salary to the plaintiff and out of it she paid the household expenses. The flat was subject to an incumbrance for $2,100 and he was not able to pay insurance and taxes on the property and borrowed money for these purposes. The conduct of the plaintiff in attempting to conceal the letters and in making, under oath, statements

grossly false, justified the referee in disbelieving her testimony. We shall not pursue this subject further, because on well settled principles the finding of the referee in respect to it should be upheld.

On the subject of tracing the funds, counsel for the respondent rely on the legal proposition that the burden was on the appellant to prove that the money embezzled went into the policies; that when the funds cannot be traced, the equitable right of the *cestui que trust* to follow and reclaim a trust fund fails; that the right to follow and reclaim a trust fund is always based upon the right of property and not on the theory of preference by reason of an unlawful conversion. For this construction counsel rely on the following cases: *Bromley v. C., C., C. & St. L. R. Co.* 103 Wis. 562, 79 N. W. 741; *Boyle v. Northwestern Nat. Bank,* 125 Wis. 498, 103 N. W. 1123, 104 N. W. 917; *Bosworth v. Hopkins,* 85 Wis. 50, 55 N. W. 424. The *Bromley Case* is most nearly in point, as in that case the defendant sought to enforce a trust against an insurance policy when it was claimed that it had been procured by the husband of the deceased by the use of money wrongfully diverted from one of the defendants. It appeared that the plaintiff had intrusted her husband with considerable sums of money from her separate estate and had also furnished him other moneys amounting to $100 for the express purpose of paying the premiums on the policies involved. The circuit court found that it was not proven that any of the premiums were paid out of the money of the defendant. This finding was sustained in this court. The general rule contended for by counsel for the respondent in this case was declared, although it was said, "The court will go as far as it can in thus tracing and following trust money." It was also said, speaking of the claim of the defendants:

"They also contend that they are entitled to the policy of $2,000 and the proceeds thereof, on the ground that the

$99.64—being the only premium ever paid thereon—was so paid with money belonging to the defendants. If it were clearly established by the evidence that such were the facts, then we should have no difficulty in holding with the defendants. *Holmes v. Gilman,* 138 N. Y. 369, 34 N. E. 205." *Bromley v. C., C., C. & St. L. R. Co.* 103 Wis. 562, 567, 79 N. W. 741.

The wide difference from the case now before us is quite apparent. Here it was found by the referee that all the moneys which maintained the policies during the period were paid from funds belonging to the appellant which had been wrongfully appropriated by the deceased.

It is another contention of the respondent's counsel that since the deceased sometimes gave notes and due-bills to the agent of the insurance company, which were later paid, this negatives the claim that the premiums were paid by the moneys embezzled; that whenever such notes or due-bills were given the premiums were thereby paid, and it should be presumed they were paid by Paul's money and not money taken from the appellant. It is true that as between the assured and the company the acceptance of these forms of credit operated to extend the time of the payment and kept the policies alive. But it was not until the payments were actually made that the real consideration for carrying the insurance was received by the company. It was not until then that the investment by Paul was made, and it is the investment by the wrongdoer in other property which gives the *cestui que trust* the right to follow the funds to their destination. Counsel for the respondent greatly rely on *Thum v. Wolstenholme,* 21 Utah, 446, 467, 61 Pac. 537. In that case the assured gave his note to the agent of the insurance company for the first premium on a policy. The agent transferred the note for value before maturity. It was held that the transfer of the note before due vested the title to the policy in the assured on its delivery and that the

sale of the note by the insurance company operated as between it and the assured as a collection. It is unnecessary to cite authorities to this familiar rule that the mere taking of a note by a debtor is not a payment unless it is so expressly agreed. If, as the referee found, these premiums were paid by Paul from funds misappropriated by him, it does not seem to us very material that the payments in some instances were postponed in the manner which has been indicated. We must look at the substance rather than the form. We cannot adopt the theory that a trusted employee may embezzle the funds of his employer for years, use the spoils to maintain policies of insurance for the benefit of his family or estate, and prevent a court of equity from affording relief by the mere device of postponing payment of some of the premiums.

The general rule applicable to cases of this character is thus stated in Ruling Case Law:

"Proceedings to establish and enforce trusts are, generally speaking, governed by the usual rules as to presumptions and burden of proof, and the admissibility, weight, and sufficiency of evidence applicable in other civil actions. The burden of proof as to the existence of a trust rests on the party who alleges it, and whatever may be the rule as to the exact extent to which trust property must be followed and identified, in any particular jurisdiction, it may be stated generally that the burden of identifying the trust property in a satisfactory manner to the required extent rests on the party seeking to establish the trust." 26 Ruling Case Law, 1368.

Although in this case the proof of criminal conduct on the part of Paul was involved, it is very clear, on well settled rules, that it was not necessary to prove either the embezzlement or the tracing of the funds beyond a reasonable doubt. Nor was it necessary in proving that the moneys embezzled were used to pay for the premiums to show that the identical specie or bills abstracted were so employed.

Whatever may have been the former rule, it is not now the law that one cannot follow money in equity because it has no earmarks. 26 Ruling Case Law, 1353. It is also clear that it was competent for the appellant to prove by circumstantial evidence that the funds were embezzled and that these funds were used in paying the premiums. We are satisfied that the findings of the referee on these issues of fact were based on a clear and satisfactory preponderance of the evidence. In his decision and findings he traced the history of each policy and the payments of the premiums and carefully considered the sources of income of the deceased. He adopted, in our opinion, correct rules of law in the reception of evidence. We need not discuss the well settled rule that those findings are not to be disturbed unless the preponderance of the evidence not only appears to be against the findings but decidedly and clearly so. *Ott v. Boring,* 139 Wis. 403, 121 N. W. 126; *Wojahn v. National Union Bank,* 144 Wis. 646, 129 N. W. 1068; *Goodwin v. von Cotzhausen,* 171 Wis. 351, 177 N. W. 618; *Von Trott v. Von Trott,* 118 Wis. 29, 94 N. W. 798. On the other hand, we cannot give to the findings of the trial court the weight which usually attaches to such findings. We have already pointed out the serious errors as to questions of law which we find in the record, and it is by no means clear that the findings of fact would have been the same if these errors had not been committed. It was very recently said in an opinion by Mr. Chief Justice Vinje:

"If the trial court did not apply the right legal test to the evidence, then its findings of fact have no potency to control the judgment of this court as to what they should be." *Will of Boardman,* 178 Wis. 517, 190 N. W. 355; *Kelley v. Crawford,* 112 Wis. 368, 88 N. W. 296; *Luckow v. Boettger,* 140 Wis. 62, 121 N. W. 649.

It is further claimed by counsel for the respondent that in any event the appellant is entitled only to a lien upon the proceeds to the extent that stolen or embezzled moneys were

actually used in the payment of the premiums on each policy. It was on this theory that the trial judge held that the appellant was entitled to only $33.28 and interest. Although there are many decisions dealing with the right of the *cestui que trust* to follow the proceeds of funds misappropriated by trustees, there are comparatively few which relate directly to the recovery, when insurance policies have been maintained by such funds. Counsel for the respondent rely especially on *Thum v. Wolstenholme*, 21 Utah, 446, 467, 61 Pac. 537. In this case there had been misappropriation for the payment of premiums in the sum of $5,110. It was claimed by the plaintiff that the entire amount of $50,000 derived from the policies should be applied to reimburse the trust fund. The court held that the first premium was paid out of the assured's own funds and in such a manner that title to the policy vested in him, and that if there was any trust it was a resulting trust. It was held that while the fund was not impressed with a trust such as would absorb the fund, yet it was subject to an equitable lien in the nature of a resulting trust to the amount of the bank's funds used in paying the second and third premiums, with interest. Although there was allowed a recovery of no more than the premiums paid, there was a vigorous dissenting opinion by Mr. Chief Justice BARTCH, holding that there was a constructive trust, and that when one standing in a fiduciary relation makes a profit under such circumstances as existed in that case the profit belongs to the *cestui que trust*. In the opinion the case of *Holmes v. Gilman*, 138 N. Y. 369, 34 N. E. 205, is quoted with approval. In the *Holmes Case* policies aggregating $45,000 had been procured and maintained by misappropriated funds. The faithless partner had by means of false entries in the books converted over $220,000. It was argued by counsel for the defendant that the funds had not been traced and that the funds used in the payment of the premiums were mingled with the property right of the wife, called her insurable

interest in her husband's life, so that the policies were not wholly the result of the use of the misappropriated funds, and that the lien on the policies must be limited to the amount of the premiums paid with the funds wrongfully converted.    It was held that the wife had suffered no loss so long as the premiums were not paid by her, and that her property had not been used for any purpose; and that she must claim the policies subject to the means used by her husband to procure them and adopt his methods; and that the *cestui que trust* was entitled to follow the funds and take the money or the policies, at his option.    It was not decided what would be the rights of the parties if the funds from the policies had exceeded the whole amount of the misappropriated funds.    The report of the referee was affirmed allowing a lien on the policies for the full value of $45,000.

In the present case, as already stated, counsel for the respondent claim the limit of the lien would be the amount paid on the premiums.    Counsel for the appellant claimed in their answer and now claim a lien equal to the amount of the funds embezzled and no more.    Three of the policies were issued with Paul's mother as beneficiary and before his marriage.    The referee did not undertake to ascertain the defalcations prior to January 1, 1914, although there was testimony as to such misappropriations.    He found that two thirds of the premiums on the New England policy number 245,641 for $1,000 had been paid by money embezzled, and held that there should be impressed on the policy and its proceeds a trust for two thirds of the $1,000, and that the remainder was owned by the plaintiff.    As already appears, there is but little authority to guide us in determining the extent to which a trust should be impressed on the proceeds of misappropriated funds in a situation like that now before us.    We are of the opinion that the mode of apportionment adopted by the referee was equitable and as favorable to the plaintiff as can be fairly claimed. We cannot sanction the proposition that a fiduciary may

Truelsch v. Miller, 186 Wis. 239.

embezzle large sums of money, use some of it in maintaining life insurance, and that the injured party has no remedy except to recover the amount paid for the premiums, which may be only a small fraction of the amount embezzled. It would open too wide a door for the perpetration of the grossest fraud.

Some claim is made by counsel for the respondent that the appellant is precluded from recovery because of gross laches in the prosecution of his claim. The referee refused to find that there had been such delay. The trial court did make such a finding but did not make it the basis of the judgment. On the contrary, the appellant was allowed a recovery of the amount already stated. We have examined the record, and although there was much delay in the conduct of the litigation, there were such complications as excused much of it, and the delay was by no means wholly due to the appellant. This contention of the respondent's counsel is not sustained.

It is further claimed and argued that any demand of the appellant was against the deceased; that the plaintiff owned the policies as her separate estate and that she had the right to defend her title; and that neither she nor the fund in court should be subjected to the payment of costs. The appellant was successful in the hearing before the referee, and in our opinion was properly allowed the costs. It is our conclusion that the trial court should have confirmed the report of the referee.

*By the Court.*—Judgment reversed, and the cause remanded with directions to confirm the referee's report and render judgment accordingly.

Eschweiler, J., dissents.

A motion for a rehearing was denied, with $25 costs, on March 10, 1925.