WESTPHAL et al. v. KANSAS CITY LIFE INS. CO.

Civil Action No. 283.

District Court, E. D. Wisconsin.

Feb. 27, 1941.

Arnold C. Otto, of Milwaukee, Wis., for plaintiffs.

Olwell & Brady, of Milwaukee, Wis., for defendant.

DUFFY, District Judge.

This action is brought by the plaintiffs to recover upon three life insurance policies issued by the defendant insurance company upon the life of F. Gilbert Westphal, who disappeared on November 5, 1931.

The case was submitted to a jury upon a special verdict consisting of three questions, asking the jury's determination as to whether F. Gilbert Westphal died on or before May 28, 1932; April 30, 1932; and November 26, 1931. The jury answered "Yes" to each question. Each date indicated was the last day upon which one of the three insurance policies in question was in full force and effect.

At the close of the testimony, the defendant moved for a directed verdict, upon which the court reserved ruling under rule 50(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. The matter is now before the court upon motions after verdict which ask (1) that the court change the answer to each question from "Yes" to "No", and (2) for judgment notwithstanding the verdict. There is also an alternative motion before the court, which was timely made, that in the event that the court sustains the verdict of the jury, the court determine whether the premium payments made by Westphal to continue the policies in force were made with premiums or funds owned by the defendant, and that the court determine that the proceeds from said policies be in fact declared to be the property of the defendant.

F. Gilbert Westphal was employed as cashier in the Milwaukee Office of the defendant insurance company, operated by The Madden Agency. The evidence disclosed that for a period of some months before his disappearance, he had used for his own purposes funds of the company collected as insurance premiums, depositing a portion of such funds in his bank accounts which he maintained in Chilton, Wisconsin, his former place of residence. The amount of the shortage proved on the trial was approximately $1,500, and proof of additional shortages was not made because the policy holders involved did not live in this immediate vicinity and were not available as witnesses. The bonding company which was on Westphal's bond settled

with the defendant company by paying some $2,400.

F. Gilbert Westphal was last seen on November 5, 1931, and has not been heard from since. He was a man of rather slight stature, weighing about 130 lbs. When he left home he kissed his wife goodbye, and took none of his personal effects with him. He had been on very cordial relations with his immediate family, and the night before his disappearance had taken his wife and oldest daughter downtown after the supper hour and treated them to ice cream. He was well liked by all who knew him. His home and family ties were very strong. His wife testified that he had been ill the night before, being distressed in the stomach, and that he took soda for relief. Mrs. Westphal likewise testified that a Mr. Lippert of the Madden Agency had telephoned her on November 5 that Westphal had left a note saying he was ill on the same day.

The week end before his disappearance, Westphal and his wife had attended a party given by friends at Fond du Lac. The members of his family and others present noticed nothing of an unusual nature. He did not seem to be troubled, worried, or depressed. On November 1, he had been given a raise in salary from $150 to $175 a month.

Mr. Westphal was on friendly terms with his parents and his brothers, several of whom were ministers, and all of more or less prominence. During his college days he would preach on Sundays on occasions when ministers were absent. He had been elected to the School Board by the citizens of Chilton. He acted as treasurer of the board, handling about $50,000 per year, without complaint. For eight or nine years he was employed in the bank at Chilton, of which his father-in-law was president. In the winter of 1929 and 1930 he was in charge of the Greenleaf Bank, of which his father-in-law was likewise president. He owned a 1929 Essex automobile, which was mortgaged. His wife had some property, a portion of which had been used to pay the family living expenses, etc. The Westphals' home life was simple, Mrs. Westphal doing her own work.

In addition to the chattel mortgage on his car, amounting to $250, Westphal had an unpaid note at the Chilton State Bank for $400; and on the day he disappeared, he obtained $450 from a local bank upon a check which was no good. The auditor from the Home Office of the defendant company had been in Milwaukee from October 22nd to 26th, auditing Westphal's accounts. While here, a policy holder came in complaining of the nature of the receipt which Westphal had sent to him. Upon questioning by the auditor, Westphal was unable to explain how this had occurred.

Mr. Westphal was able to embezzle money over a considerable period by reason of the bookkeeping methods in the cashier's office of The Madden Agency. A method frequently resorted to by Westphal was, when a policy holder would pay in an annual premium, Westphal would report to the company as having received a quarterly premium, keeping the balance for himself. On a number of occasions when the next quarterly premium would become due, Westphal had to make good in order to escape detection.

Mr. Westphal left a letter for his wife, as follows:

> "Milwaukee Wisc.
> "Nov. 4–31.

"My Dear:

"When you receive this letter you will know that I am gone, not to return until I proove before myself & my God that I am worthy of you & our three beautiful daughters.

"I know that you can not stand a shock such as this is going to be & still remain with me as my wife. I am therefore removing all danger of my presence annoying you by quietly slipping away.

"Grandpa Connell loves you all dearly & you will not want for anything.

"I have worked hard and have felt that I was worth more than the $150 the Co. paid me. Consequently I borrowed it from them out of premium deposits paying them six per cent interest on the same. There is always an end to anything like this and this is the end.

"Do not blame Lou Madden for anything he may do in regard to my failure to carry out his trust. He has always been fine to me, much better than I deserve.

"Goodby Sweetie & may your loved ones be kinder to you than I have been is the wish of

> "Your Tubbie.

"There is a chattel on the car. (The car is in the garage.) Payments are due on the 21st of each month at the Wisc. Acceptance Corp. I long to kiss you but dare not. I love you.

> "F. G. W."

He likewise wrote a letter to Mr. Louis E. Madden, the head of the Madden Agency, dated November 4, 1931, but postmarked in Milwaukee on November 6, as follows:

"November 4, 1931.

"Louis E. Madden,

"310 Bankers Bldg.,

"Milwaukee, Wis.

"My Dear Lou:

"I feel that this is going to hurt you keenly, yet I must tell you that I have not been faithful to the trust you have placed in me. You have always been so fine to me—much better than I deserved.

" 'Buzz' Hale was right—I have used premiums paid in to the Company. No policies have been allowed to lapse, and the Company has received six per cent interest on all the money I have used.

"I have tried to work hard for you and have given practically all of my time and labor, but feel that the Company did not actually pay me what I earned—nor enough to get along on and support my wife and children in the way to which they were accustomed.

"For my wife's sake and that of the children, I believe that my father-in-law, Mr. Connell of Chilton, will make good anything that the Company desires.

"I myself am going to try to go to some town in which I can get an absoluteley new start and try to make good—or I will pass out in the attempt.

"There seems to be no other way out, and I feel that I cannot look you in the eye again until my self-respect and my innermost self tells me that I can come to you with clean hands and in a position to repay all that I am in arrears.

"Most sincerely yours,

"FGW                                    Gil"

No warrant was ever issued for Westphal's arrest. An advertisement was run in the "Chicago Tribune", a paper often read by Westphal, informing him that all was well and that he need not stay away. Westphal also knew that his father-in-law and his father and brothers were financially able to make good the amount of the defalcation if they desired to do so.

The motions now before the court have given me considerable concern. Had I been a member of the jury, without hesitation I would have answered "No" to each question. There was no evidence, except inferences that might be drawn, to prove Mr. Westphal died within 21 days of his disappearance (Question 3), or within 5 months and 25 days thereafter (Question 2), or within 6 months and 23 days thereafter (Question 1). The letters from Westphal, heretofore set out, would have been decisive in my mind.

I recognize, however, that the trial judge is not the trier of the facts, and the law does not require that the evidence shall satisfy him. Viereg v. Southwestern Wisconsin Gas Co., 212 Wis. 394, 248 N.W. 775. I recognize also that upon a motion to direct a verdict for the defendant, evidence and the reasonable inferences to be drawn therefrom must be considered in the light most favorable to the plaintiff. Trautmann v. Schefft & Sons Co., 201 Wis. 113, 228 N.W. 741; Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720. Upon this motion for a directed verdict, the court must assume that the plaintiffs' evidence is true, and must extend credit to every fair inference therefrom. Prairie Farmer Pub. Co. v. Indiana Farmer's Guide Pub. Co., 7 Cir., 88 F.2d 979.

With these rules in mind, we must consider the applicable Wisconsin law. It is without dispute that the rule has been established in this State that when a person disappears from his home and family and has not been heard from for seven years, such person is presumed to be dead at the end of such seven year period; but there is no presumption of either life or death as to any particular time during the seven years. Wisconsin Trust Co. v. Wisconsin Marine & Fire Insurance Co. Bank, 105 Wis. 464, 81 N.W. 642; Whiteley v. Equitable Life Assurance Soc. of U. S., 72 Wis. 170, 39 N.W. 369.

In this case, in order for the presumption of death to arise, it was not necessary for plaintiffs to prove that Westphal encountered or was exposed to some specific peril at or about the time he disappeared, or that he came within the range of some impending or immediate danger which might reasonably be expected to destroy life. Delaney v. Metropolitan Life Insurance Co., 216 Wis. 265, 270, 257 N.W. 140. Nor was it necessary under Wisconsin law to prove diligent search and inquiry. Miller v. Sovereign Camp W. O. W., 140 Wis. 505, 122 N.W. 1126, 28 L.R.A.,N.S., 178, 133 Am.St. Rep. 1095.

The outstanding Wisconsin cases which deal with the issue of death at a specific time within the seven year period are Delaney v. Metropolitan Life Insurance Co., supra; Dobelin v. Ladies of the Maccabees

of the World, 171 Wis. 54, 174 N.W. 897; White v. Brotherhood of Locomotive Firemen, 165 Wis. 418, 162 N.W. 441; and Wisconsin Trust Co. v. Wisconsin etc., Bank, supra.

In the Delaney case, a married man, of regular habits, and a steady worker, lived peacefully with his wife, did not drink, was earning better wages than ever before, and customarily spent his evenings at home. One morning he left his home at the usual time, bound for work, kissed his wife goodbye, and was never heard from thereafter. The issue in that case was whether Delaney died at or about the time of his disappearance. The Supreme Court said (216 Wis. 265, 269, 257 N.W. 140, 142): "It seems to us that, in view of the fixed character of insured's habits and daily routine, as well as the absence of any motive for disappearance or absconding, the sudden and complete break in this routine will reasonably support the inference that he died upon the date of his disappearance, * * *."

In the Dobelin case, supra, an unmarried man was on friendly terms with his nearest relatives who were his sister and her husband. He was irregular in his correspondence with them, and sometimes they would not hear from him for a matter of years. On June 27, 1911, his sister received a telegram from Nevada, purporting to be signed by her brother, asking for a loan of $50, promising repayment within 15 days, and asking that she telegraph the money. She did so. The following day another wire arrived, stating that he could not identify himself and asking for a waiver of identification. This the sister sent. No further word ever came from him, and more than seven years passed before the suit was commenced. The issue was whether he died within 4 years and 9 months after the date he sent the telegram. The trial court found that he had died within the period mentioned, and the Supreme Court by a four to three decision reversed the trial court, saying that the absent man was a wanderer with but the very slightest of home ties, and that his failure to communicate was as consistent with a theory of continued life as with an inference that such repayment was not made because of death interfering, and held that the plaintiff had not carried the burden of proof.

In the White case, supra, an unmarried man, who was industrious, and sober, and lived on affectionate terms with his mother and sisters, corresponded with them regularly when working away from home. He had $150 savings in the bank. He was last heard from by his family in Iowa in the year 1901. No reason of any kind was indicated for his disappearance. More than seven years passed, and the issue in the case was whether he had died during the year 1901. The trial court so found, and the Supreme Court upheld the finding.

In the Wisconsin Trust Company case, supra, there was a proceeding before the probate court, and the Supreme Court in its opinion said (105 Wis. page 468, 81 N.W. page 643): "* * * The presumption of law is that at the expiration of seven years he is dead, but there is no presumption, either of life or death, during that period. * * * The question when such presumed death occurred is to be determined from all the facts and circumstances in the case. * * * A representation, such as is contained in one allegation of the petition, that Luebke had last been seen at a period within seven years, standing by itself, with no qualifying circumstances, would not sustain jurisdiction. But there were other facts set out in the petition which it was proper for the court to consider. Luebke was last seen at Leadville. He was acting queerly. He wanted to be put in an asylum to escape his enemies. He fancied that officers were in pursuit of him. He left the train somewhere between Leadville, in Colorado, and Ogden, in Utah, leaving his baggage. Strict search was made for him. Printed notices of his disappearance, offering a reward for information as to his whereabouts, were sent out. Photographs of the missing man were also sent out with such notices, and freely circulated in the section of the country where he was last seen. Inquiries were made at all the asylums for treatment of the insane in the West, and yet no word was received from him, and he has not returned. * * *"

It appeared in that case that the missing man was a traveling salesman, unmarried, and his only heirs were the children of a deceased brother. The full period of seven years had not elapsed when the application for administration of his estate was filed. The court said (105 Wis. page 469, 81 N.W. page 643): "* * * These facts, with nothing to control the inferences naturally to be drawn from them, presented at least a *prima facie* case of death, even within the seven years. The presumption of death, of course, was not conclusive, but was sufficient to sustain the conclusion of

the county judge, and gave him a colorable right to proceed. \* \* \*"

Other Wisconsin cases usually cited in discussing the question now being considered can be distinguished, because in each such case the issue was whether the missing person was dead at the end of the seven year period. These cases are Ewing v. Metropolitan Life Insurance Co., 191 Wis. 299, 210 N.W. 819; Hansen v. Central Verein, etc., 198 Wis. 140, 223 N.W. 571, 64 A.L.R. 1284; Egger v. Northwestern Mutual Life Insurance·Co., 203 Wis. 329, 234 N.W. 328. These cases stand for the proposition that proof of absence for seven years, without tidings (assuming existence of some family connection to whom tidings might come), makes a jury issue of whether the missing person is dead at the expiration of the seven years, even though the opposing proof discloses a good reason for the disappearance and a good reason for the missing person not having communicated with relatives.

A case at the opposite extreme from the Delaney case, supra, is the Hansen case, supra, where the evidence disclosed that the insured had separated from his wife and family, was a heavy drinker, and had been arrested for abandonment on the complaint of his wife. He was found guilty, placed on probation, and shortly thereafter disappeared. The circuit court directed a verdict for the plaintiff. The Supreme Court reversed, holding that it could not be said *as a matter of law* that he was dead, but that it was a question for the jury to determine. The continuing evidentiary effect of the presumption was met by a strong probability that he would not have communicated, and the court held that it was a question of fact as to which was the more convincing.

Counsel for both parties in the case at bar admit that under Wisconsin law the plaintiffs had the burden of proof to establish the affirmative of each of the three questions in the verdict to a reasonable certainty by a preponderance of the evidence, and that such evidence might be either direct or circumstantial. However, defendant contends for the rule that resort to circumstantial evidence can only be had if the conclusion arrived at is the only one that can fairly and reasonably be drawn from the circumstances, and that every other hypothesis must be excluded. That undoubtedly is the law of Minnesota (see Sherman v. Minnesota Mutual Life Ins. Co., 191 Minn.

607, 255 N.W. 113, 115); but we are required to apply the Wisconsin law.

In the White case, supra, our Supreme Court said (165 Wis. pages 422, 423, 162 N.W. page 442): "In the. instant case it is undisputed that White had been unheard of for more than seven years, and the material question is, At what particular time during the seven years he was unheard of did he die? This is a question of fact, to be determined by the trial court or a jury. Whiteley v. Equitable L. A. Soc., supra; Miller v. Sovereign Camp W. O. W., supra; Butler v. Supreme Court I. O. F., 53 Wash. 118, 101 P. 481, 26 L.R.A.(N.S.) 293; Tisdale v. Connecticut Mut. L. Ins. Co., 26 Iowa 170, 96 Am.Dec. 136."

In the Egger case, supra, the court said (203 Wis. pages 336, 337, 234 N.W. page 330): "While the court may direct a verdict establishing the death of the absent one where the circumstances are unambiguous, where the circumstances under which one leaves his home are ambiguous and cast doubt upon the probability of his communicating with his family even though he be alive, it must in nearly all instances give rise to a question of fact to be determined by the jury. A man may leave his home declaring that his family will never hear from him again. This certainly renders his communication with his family less probable than if he had left under normal circumstances. But different minds may draw different inferences as to whether even under such circumstances the mellowing influence of seven years would not be sufficient to bring about a mollification of his attitude so that natural human instincts would prevail and prompt him to communicate with his family. Where different inferences may be drawn by different persons from conceded facts, a jury question is presented. \* \* \*"

It is very true that the issue in the Egger case, supra, was whether the absent one was dead at the expiration of the seven year period, but nevertheless the language used by the court is quite persuasive.

The case at bar is in many respects like the Delaney case, supra. In each case there existed domestic tranquility of insured and his wife; insured had a fairly good position; he had steady and regular habits; he had attended church regularly and had religious affiliations; he was not a wanderer and he spent his leisure time at home with his wife. In the Delaney case there was no motive for leaving

home. In the case at bar such motive existed. In addition, in this case, taking the plaintiffs' evidence as true, the insured had been ill the night before and was also ill the day of his disappearance.

I am compelled to the conclusion that, under the Wisconsin decisions, the question as to the time of the death was for the jury, and that, viewing the evidence in the light most favorable to the plaintiffs, there was sufficient to sustain the answers to the verdict. Therefore, the motions of the defendant to change the answers and for judgment notwithstanding the verdict must be denied.

▮ We then must consider the further motion of the defendant asking for proceedings subsequent to the verdict to determine whether the premium payments which maintained the policies in force at the date of the disappearance were made from funds belonging to the defendant, and whether, if such fact be established, said policies or their proceeds are not the property of the defendant, on account of such payments having been made with funds embezzled from the defendant.

It was apparent there would be no necessity of a finding upon this question if the other motions of the defendant were granted. No request was made, by either party, to submit any question to the jury covering such contention. The issue is raised by an amendment to the answer.

▮ The case Truelsch v. Miller, 186 Wis. 239, 202 N.W. 352, 38 A.L.R. 914, enunciates the doctrine that an embezzler is a constructive trustee in that if the funds embezzled can be traced, the beneficiary of the trust is entitled to the proceeds of a life insurance policy, the premiums of which were paid out of the embezzled funds. The rule is further laid down that if all of the premiums were not paid with embezzled funds, but proof is made as to a portion thereof having been thus paid, then the cestui of the constructive trust is entitled to recover from the proceeds of the policy in the same proportion as his wrongfully appropriated funds were used to pay the premiums, as compared with the total sum used for premium payments.

The defendant may give notice of a hearing to determine the procedure as to the question raised by the amendment heretofore stated. At said hearing a determination will be made as to whether further testimony is necessary, and times for briefs to be filed upon this question will be fixed.