Argued December 3, reversed December 21, 1926.

# EDWARD MACE, ADMR., *v.* CHARLES TIMBER-MAN.

### (251 Pac. 763.)

**Witnesses—Leading Question to Plaintiff's Witness on Direct Examination as to Statement Contrary to Prior Statement Through Interpreter Held Proper (Or. L., § 861).**

1. Where plaintiff's witness testified through interpreter, in administrator's action for money appropriated by defendant, that latter said that his sister spent money which decedent had entrusted to her, plaintiff's counsel was properly permitted, under Section 861, Or. L., to ask witness a leading question, for purpose of refreshing her memory, as to telling counsel that defendant said he had money, and was going to keep it, especially where apparent truth was elicited thereby.

**Witnesses—Leading Questions are Permissible in Furtherance of Justice, to Refresh Witness' Memory.**

2. When it is apparent that it will be in furtherance of justice, leading questions are permissible to refresh memory of witness and aid his recollection.

**Evidence—Statement Which Witness Testified She Made and Affirmed was True Held Substantive Evidence That Defendant Made Statement Attributed to Him Therein.**

3. Plaintiff's witness, having testified that she made statement, as to which questioned on direct examination, and affirmed that it was true, it became substantive evidence that defendant made statement attributed to him therein.

**Witnesses—Deceased's Statements as to Defendant's Theft of Money and Amount Thereof Held Admissible to Rebut Defendant's Testimony as to His Statements Regarding It (Or. L., § 732, Subd. 2).**

4. Where defendant, sued by administrator for money appropriated, testified in his own behalf as to deceased's statements against interest, to effect that he left money, contrary to defendant's advice, in care of his sister, and that she spent it and contradicted deceased's statement as to amount, deceased's statements as to defendant's theft of money and amount thereof were admissible on plaintiff's behalf under Section 732, subdivision 2, Or. L., though defendant was called as witness by plaintiff.

1.  See 28 R. C. L. 590.
2.  See 28 R. C. L. 590.

Evidence—Trustee's Declarations as to Amount of Money Entrusted to Her by Plaintiff's Decedent Held Admissible Against Defendant Alleged to have Appropriated Money After Trustee's Death.

5. In action for money appropriated by defendant after death of one to whom plaintiff's decedent entrusted it, trustee's declarations as to amount were admissible as substantive evidence against defendant.

Evidence—Relevant Declaration Against Interest is Competent, Though Declarant is not Party, or in Privity With Party, to Action (Or. L., § 708).

6. Declaration against interest is competent when relevant, though declarant is not party, or in privity with any party, to action, especially in view of Section 708, Or. L.

Evidence—Decedent's Declarations as to Amount Entrusted to One by Other Held Admissible in Trustor's Administrator's action Against Third Party Appropriating Money After Trustee's Death.

7. Decedent's declarations as to amount of money entrusted to one by other *held* admissible as best evidence obtainable in action by trustor's administrator against third party appropriating money after trustee's death.

Executors and Administrators—Judgment for Administrator, Suing for Decedent's Money, Appropriated by Defendant After Trustee's Death, Held Supported by Evidence.

8. Evidence *held* sufficient to support verdict for administrator suing for money appropriated by defendant after death of one to whom entrusted by plaintiff's decedent.

Executors and Administrators—Defendant's Appropriation of Money, Sued for by Owner's Administrator, Held for Jury.

9. Whether defendant appropriated money, for which sued by deceased's owner's administrator, *held* for jury on conflicting testimony.

---

Appeal and Error, 4 C. J., p. 905, n. 37.
Evidence, 22 C. J., p. 232, n. 83, 84, 85, 93.
New Trial, 29 Cyc., p. 829, n. 45.
Witnesses, 40 Cyc., p. 2342, n. 34, p. 2429, n. 31, p. 2430, n. 32, 33, 35, 37, 40, p. 2431, n. 49, p. 2432, n. 52, p. 2559, n. 65, p. 2697, n. 20, p. 2764, n. 16, p. 2766, n. 23.

From Multnomah: ROBERT G. MORROW, Judge.

Department 2.

This is an action by Edward Maes, administrator of the estate of Kamiel Timberman (or Timmerman),

---

6.  See 1 R. C. L. 468.

deceased, against Charles Timmerman, for $5,000, alleged to have been appropriated by the defendant. The cause was tried to the court and a jury. A verdict was returned in favor of plaintiff for the sum of $3,550, and a judgment entered thereon.

On motion of defendant the court set the judgment aside and granted a new trial for the reason of an alleged error of the court in allowing Mrs. Nora Maes to answer a question by plaintiff's counsel concerning a conversation she had with defendant. Plaintiff appealed from the order, setting aside the judgment.                                    REVERSED.

For appellant there was a brief and oral argument by *Mr. T. J. Cleeton.*

For respondent there was a brief and oral arguments by *Mr. C. Henri Labbe* and *Mr. Johnston Wilson.*

BEAN, J.—A general history of the facts bearing upon the case is about as follows, as stated in the briefs:

Before the death of some of the members, the Timmerman family (improperly spelled Timberman in the pleadings) in Portland, consisted of the defendant, Charles Timmerman; his brother Kamiel Timmerman, a bachelor; a sister, Nora Maes, and a sister Mary Vermeulen. There were also three sisters in Belgium. All these parties are Belgians.

Charles Timmerman is married. His wife, Johanna Timmerman, was joined as party defendant in the suit as originally filed. The lower court, during the trial of this cause, dismissed the suit as against Johanna Timmerman, as there was no evi-

dence to sustain the allegations of the complaint against her.

Nora Maes is the wife of Edward Maes, the plaintiff (improperly spelled Mace in the pleadings). Nora Maes, whose testimony is hereinafter discussed, testified through an interpreter.

In September 1921, Angella, a daughter of Peter and Mary Vermeulen, became very ill with typhoid fever. On the fourteenth day of October, 1921, the mother, Mary Vermeulen, was seized with the same malady and died October 19, 1921.

Kamiel, Timmerman, the brother, had made his home with his brother-in-law, Peter Vermeulen, and his sister, Mary Vermeulen, Peter's wife, for some seven years prior to his death. The evidence tended to show that he turned over to the sister, Mary, all his earnings for safekeeping. She looked after the same and kept it in a trunk or basket, in her residence. It is claimed he had saved between $3,500 and $5,000, which, at the time Mary was stricken with a fatal illness, was in her possession. Kamiel was stricken with an illness about the same time and on the day after Mary's death he was sent to the hospital where he died November 12, 1921.

Charles Timmerman and Johanna Timmerman, his wife, lived in the same block with Mary Vermeulen and Peter Vermeulen, and were in the house at the time of Mary's illness and death, and in and about the house thereafter. Peter Vermeulen, Mary's husband, almost immediately became insane and was sent to the state hospital for the insane, where he now is.

The premises were left in Charles Timmerman's care. He and Johanna Timmerman, his wife, took possession of the premises, and all the effects of Peter

Vermeulen and Mary Vermeulen, and moved the same over to their own residence. He was later appointed guardian of Peter's estate.

The day of Mary's funeral Kamiel complained of not feeling well and was urged to consult a doctor. He did so, accompanied by Edward Maes, plaintiff herein. He never returned to his home, but entered the hospital the same day where he died three weeks later, on November 12, 1921.

On the day of his entry into the hospital he was visited by his sister Nora, and her husband Edward Maes. At this visit he requested Edward Maes to go to Peter's and get his money from a basket, or clothes hamper, in the front room of Peter Vermeulen's home. Maes went to the Vermeulen home and in the presence of his wife, and Peter Vermeulen, broke the lock of the basket and examined the contents thereof and found nothing of value. He then returned to the hospital and reported to Kamiel.

On a second search Maes found Kamiel's last pay of $42.22 in a tobacco can on a shelf in the basement where Kamiel had been sleeping. Maes then went to Charlie Timmerman's house and reported to Charlie that the money was gone and Charlie said, "I was thinking so. Mary has spent it all." Kamiel sent for Charlie Timmerman and on Charlie Timmerman's failure to explain the disappearance of the money, Kamiel said "You stole my money."

Upon the trial of the cause Nora Maes was called to testify to a conversation had between Kamiel Timmerman, now deceased, and Charlie Timmerman, the defendant at the hospital, after it was discovered that the money was gone. She also testified to a conversation she had with the defendant. Her testimony was translated into English by an interpreter appointed

by the court.    She testified that she went with Charlie
Timmerman to the hospital to see Kamiel, and then
as follows:

"What did Kamiel say to you and Charlie?

"Mr. Labbe: We object to that.    That was made in
the presence of Charlie?

"Q. Who else was present, anybody else?

"A. He was alone in the room.

"Q. What did he say?

"The Court: Who was there when the statements
were made?    I thought she said he was alone.    Ask
her who was there when the statements were made?

"A. Nobody but her and her sick brother and
Charlie.

"Q. What did Kamiel say, if anything, to you and
Charlie then?

"A. He wanted to know who was there, and he
says, 'It is Norah and Charlie.'

"Q. What else did he say?

"Mr. Labbe: Did she say he wanted to know who
was there?

"Interpreter: Yes.

"Mr. Labbe: Who said it is Nora and Charlie?

"The Witness: The sick man.

"Q. What did Kamiel then say to you and Charlie,
if anything?

"A. He wanted to know if Charlie had got his
money, and then Kamiel said to Charlie, 'Nobody took
it but you.'

"Q. What did Charlie say?

"A. Charlie say, 'No.'

"Q. Then what was said by Kamiel, if anything?

"A. 'You took it.'

"Q. What did Charlie say, if anything, then to
Kamiel?

"A. He said he would see that he got it (as added
upon cross-examination), 'When he got well.'

"Q. What did Kamiel say then, if anything?

"A. That is good.

"Q. What did you and Charlie then do, if anything?

"A. Charlie said he only told Kamiel that because he knew he was going to die and he wanted him to trust him.

"Q. Where did Charlie tell you this?

"A. Outside.

"Q. What else, if anything, did Charlie tell you then about the money?

"A. Said he didn't know anything about it.

"Q. Did you ask Charlie when he was going to get that money and divide it among the children? * *

"Q. Did you have any other conversation later on with Charlie? Was anything further said between you and Charlie when you went outside the house than what you already stated?

"A. No.

"Q. Did you have another conversation with Charlie about Kamiel's money?

"A. Yes.

"Q. When?

"A. On the way.

"Q. What did you say to Charlie, and what did Charlie say to you then?

"A. He don't know,—I don't know.

"Q. You don't know what you said, and what he said to you?

"A. No, Charlie he have said, 'I don't know.'

"The Court: There is a misunderstanding. The question was, at this conversation afterward what did you say to Charlie, and what did Charlie say to you about the money?

"Mr. Cleeton: Yes.

"A. My sister spent it all.

"Q. Charlie said,—

"A. My sister spent it all.

"Q. Did Charlie say that, my sister spent it all?

"A. Yes; I told my brother my sister never spent the money.

"Q. What did he say then?

"A. 'Where is it?'

"Q. What did you say?

"A. 'You know where it is.'

"Mr. Timberman: No, that is not what she said.

"The Court: Ask the question again.

"Q. Then what did Charlie say when you said, 'You know where it is?' What did Charlie say?

"A. She says that his sister spent it.

"The Court: The answer is so clearly not responsive there must be some misunderstanding. After she said, 'Where is the money,' then the question is, what did Charlie say to that?

"Q. What did Charlie say after that, if anything?

"A. All Charlie said, that his sister spent the money. She said, 'No, my sister didn't.'

"Q. She said,—Who said?

"A. Norah.

"Q. This witness answered, 'No, I did not.'

"A. Yes."

Counsel for plaintiff then propounded the following question to which counsel for defendant objected.

"Q. Ask her this question now. Did you not tell me in my office a few days ago that Charlie told you that it was no use for Mr. Mace to spend his money with lawyers hunting for the money because he had it and he was going to keep it, or words to that effect?

"Mr. Labbe: I object to that; he is impeaching his own witness, and it is a leading question.

"Mr. Cleeton: I am refreshing her memory. I am not trying to impeach her. * *

"(After objection and argument.)

"Q. Did you have any other conversation with Charlie about Kamiel's money after this you have mentioned?

"A. Yes.

"The Court: What was it? Give us the conversation.

"A. My brother that died said—

"Mr. Labbe: Hold on; that is not responsive, what the brother said.

"Q. What Charlie said, not what Kamiel said, but what Charlie said, if anything. Ask her if she had

any other conversation than the one she told us about with Charlie.

"A. No."

Now comes the other question. (Which was repeated by counsel as above quoted, and to which an objection was made.)

"(Interpreter repeats question to the witness.)
"A. Yes.
"Q. Was that the truth?
"A. Yes."

The witness, Nora Maes, further testified to the effect that Kamiel, when at the hospital, a short time before he died, said he had $2,000 in gold and $3,000 in paper money. This was withheld from the jury. On cross-examination Mrs. Maes stated that Charles, the defendant, made the statement, "that he had taken the money," about a year after Kamiel died; about the time this suit was commenced; that it was on a side street near Third Street, where Charlie was at work for the street cleaning department; that—

"He (Charlie) asked her if her husband had found the money. She said no.
"Q. What else did he say?
"A. I took the money.
"Q. What else did he say then?
"A. You can't do anything because there is no papers.
"Q. What else did he say?
"A. That he had it and they wouldn't get it any more.
"Q. What else did he say?
"A. He said he can go ahead and spend all the money he wants, because he has got it and they won't get it away from him any more."

That a few months after Mary died, Charlie said "the money was in a basket, but now it is in the

bank''; that she asked him when he took it and he wouldn't tell her.

The testimony indicates that Kamiel said in effect, there should be a paper showing how much money he had, that his sister Mary kept for him; and there was introduced in evidence without objection a paper found between some Liberty bonds of Peter Vermeulen's which Mr. and Mrs. Charlie Timmerman took to their house soon after Peter was sent to the asylum. On the paper was written in Mary's handwriting, as translated—''28000 francs and $140.''

The trial court, deeming it an error in not sustaining defendant's objection to the question above quoted and repeated, granted the defendant a new trial.

1. Our statute, Section 861, Or. L., confers the right and fixes the conditions under which a party may show that his own witness has made prior statements inconsistent with his present testimony: *State* v. *Merlo,* 92 Or. 678, 699 (173 Pac. 317, 182 Pac. 153). Section 861, Or. L., reads thus:

''The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony, as provided in section 864.''

2. The testimony brought out by the question objected to, clearly shows a reason for the plaintiff to be surprised by the testimony theretofore given by the witness. It was proper for the court under the circumstances of the case, to permit the plaintiff to propound the question, although it was purely a leading question, for the purpose of refreshing her memory. As it transpired, by counsel refreshing the memory of the witness, in calling attention to her

former statement, served the purpose of eliciting the apparent truth which is the paramount object of the law: *Pegram* v. *Mutual Protective League,* 159 Ill. App. 21, 22; Jones on Evidence (2 ed.), § 2385; *Sparks* v. *Johnson* (Tex. Civ. App.), 235 S. W. 975; *Williams* v. *State,* 17 Ala. App. 285 (84 South. 424). As near as can be determined from the imperfect language of the witness, as interpreted, she did not understand the former question. Either that, or she failed to understand the purport of the objection and ruling of the court. When it is apparent that it will be in furtherance of justice, leading questions may be admitted to refresh the memory of the witness and aid his recollection: 40 Cyc. 2432;. *Haynes* v. *Sosa* (Tex. Civ. App.), 198 S. W. 976.

The suggestion by defendant that the question was leading, therefore, cannot be taken as meritorious or availing: 40 Cyc. 2429 (b).

3. The witness having testified that she made the statement referred to in the interrogatory and affirmed that the statement was true, thereby rendered the statement substantive testimony tending to show that the defendant made the statement attributed to him to the effect that he had the money in question.

In discussing this section of the Code in *State* v. *Steeves,* 29 Or. 85, at page 103 (43 Pac. 947), Mr. Justice MOORE used the following language:

"This section furnishes a means of correcting the mistake in calling the witness and neutralizing the effect of his adverse testimony, by permitting the party to treat the witness as adverse, and to propound leading questions to him for the purpose of refreshing his memory; and, if he still persists in adhering to what he has said, such party may impeach him by evidence that he made at other times statements inconsistent with his present testimony. Before this

can be done, however, the statements must be related to him, with the circumstances of times, places, and persons present or shown to him if in writing; and he shall be asked whether he made such statements, and if so, allowed to explain them: Code, § 841.''

See, also, *Sparks* v. *Johnson* (Tex. Civ. App.), 235 S. W. 975.

It is stated in 40 Cyc. 2429 (b) thus:

''It is usual and proper for the court in which the case is being tried to permit leading questions in conducting the examination of a witness who is immature, ignorant, illiterate, feeble-minded, confused and agitated or embarrassed while on the stand, lacking in comprehension of questions asked or slow to understand, deaf and dumb, unable to speak or understand the English language or only imperfectly familiar therewith, or of weak or uncertain memory.''

In *Haynes* v. *Sosa* (Tex. Civ. App.), 198 S. W. 976, the syllabus reads as follows:

''It cannot be said that it is an abuse of discretion to permit a leading question to an ignorant witness, testifying through an interpreter; she having previously, without objection, stated the facts summarized in the leading question.''

There was no error in admitting the testimony to which the objection was interposed. The ruling of the court did not constitute reversible error or serve as a foundation or reason for granting a new trial.

4. Counsel for defendant contend that there were other errors of the court occurring upon the trial of the case which were grounds for granting a new trial. It is argued that there was no competent evidence to support the verdict. This contention is based upon the claim: first, that the statements of Kamiel Timmerman, since deceased, in regard to the money, were hearsay and not admissible in evidence.

Charles Timmerman had been a witness in a proceeding before the probate court, for the purpose of discovering the assets of the estate of Kamiel Timmerman, deceased, and testified there as to a conversation he had with Mary Vermeulen, now deceased, in regard to the money she had in her care belonging to Kamiel. Charles Timmerman was also a party to this case, and testified as a witness upon the trial as to statements made by Kamiel Timmerman, now deceased, against the interest of deceased, to the effect, that Kamiel would not take his advice and put his money in the bank, but that he persisted in leaving it in care of his sister Mary; and that Mary had spent Kamiel's money. That Kamiel said "it was none of his (Charlie's) business." Defendant Charlie Timmerman and Johanna Timmerman, his wife, who was a party to this action, flatly contradicted the statement of Kamiel in regard to the amount of money he had.

The fact that Charlie Timmerman was called as a witness by plaintiff would not change the matter. He contested the case and testified in his own behalf. Therefore the statements of Kamiel Timmerman, since deceased, concerning the same transaction or subject matter, testified to by the defendant in his own favor, were admissible under the proviso in Section 732, Or. L. (subd. 2), which reads thus:

" * * that when a party to an action, suit, or proceeding by or against an executor or administrator appears as a witness in his own behalf, or offers evidence of statements made by deceased against the interest of the deceased, statements of the deceased concerning the same subject matter in his own favor may also be proven."

See *Grubbe* v. *Grubbe*, 26 Or. 363, 368 (38 Pac. 182); *Goff* v. *Kelsey*, 78 Or. 337, 338 (153 Pac. 103);

*Beard* v. *Beard,* 66 Or. 526, 532 (133 Pac. 795, 797, 134 Pac. 1196); *Jones* v. *Hill,* 62 Or. 53, 57 (124 Pac. 206); *Sullivan* v. *King,* 67 Or. 429 (136 Pac. 335); *Sargent* v. *Foland,* 104 Or. 296, 304 (207 Pac. 349).

5. Defendant further contends that the declarations of Mary Vermeulen, since deceased, who was a trustee for Kamiel, and caretaker of his money for several years, in regard to the amount of money she had belonging to Kamiel, were not admissible, and that the court erred in admitting a portion of such statements, and there was no competent evidence, to show that Kamiel had any money or to support the verdict Therefore, the court was right in setting the verdict aside.

6. Mary Timmerman is now dead. The statements which she made in regard to the amount of money of Kamiel's in her keeping was against her pecuniary or proprietary interest. They were of a fact of which she was personally cognizant and there was no apparent or probable motive for her to falsify the facts or make the sum any greater than it really was. She had peculiar means of knowing the facts stated. She was the only person except Kamiel, the decedent, who knew the exact amount of the money. Her declarations in regard to the amount of the money were admissible as substantive evidence against Charles Timmerman, a third party. The fact that such declarations are not admissible during the life of the declarant, and that such statements are sometimes the only mode of proof available, are regarded as additional reason for the reception of such declaration in evidence without the sanction of an oath of the declarant: *Truelsch* v. *Miller,* 186 Wis. 239, 248 (202 N. W. 352, 38 A. L. R. 914); 1 Greenleaf on Evidence,

§§ 147, 148. The reason for the exception to the rule, excluding the hearsay evidence is stated in 1 Greenleaf on Evidence, § 148, thus:

"The ground upon which this evidence is received is the extreme improbability of its falsehood. The regard which men usually pay to their own interest is deemed a sufficient security, both that the declarations were not made under any mistake of fact, or want of information on the part of the declarant, if he had the requisite means of knowledge, and that the matter declared is true."

It is stated in 22 C. J., Section 209, page 232, thus:

"The declaration against interest is in the nature of a secondary evidence, receivable only when the declarant is unavailable as a witness; it is competent in any action to which it is relevant, although the declarant is not a party to, or in privity with, any party to the action; and it must have been, when made, to the knowledge of the declarant, against his obvious and real interest."

The exception noted to the general rule excluding hearsay evidence, appears to be well settled. It is discussed and many cases cited in the following: 4 Chamberlayne on Evidence, §§ 2770–2789; 3 Wigmore on Evidence, §§ 1455–1476; 1 Elliott on Evidence, §§ 434, 436, 439 and 441. In Section 436 of the latter volume the rule is stated thus:

"Declarations made by persons who possessed peculiar means of knowing the matter stated, and had no interest to misrepresent it, are admissible in evidence when pertinent and relevant, whether made orally or in writing, provided, first, that the declarant is dead, and secondly, that such declarations were opposed to the declarant's pecuniary or proprietary interest. They embrace entries in books, and all other written or oral declarations of facts made under the above conditions."

Section 708, Or. L., provides as follows:

"Evidence Relating to Third Persons. And where the question in dispute between the parties is the obligation or duty of a third person, whatever would be evidence for or against such person is primary evidence between the parties."

7–9. There was no error prejudicial to defendant in admitting the declaration referred to of Mary Vermeulen and Kamiel Timmerman, both now deceased. It was the best evidence obtainable. There was ample, competent evidence to support the verdict. The testimony was conflicting. It was peculiarly a question for the jury, and its verdict should not have been disturbed.

The judgment of the trial court, setting aside the verdict and granting a new trial, is reversed. The cause will be remanded, with directions to re-enter judgment on the verdict in favor of plaintiff.

REVERSED AND REMANDED WITH DIRECTIONS.

McBRIDE, C. J., and BURNETT and BELT, JJ., concur.