Argued March 22; affirmed April 4; rehearing denied April 25, 1939

# STATE *v.* DUGGER

(88 P. (2d) 990)

In Banc.

*Charles W. Robison,* of Portland (Leland B. Shaw, of Portland, on the brief), for appellant.

*Clarence A. Potts,* Deputy District Attorney, of Portland (James R. Bain, District Attorney, of Portland, on the brief), for respondent.

ROSSMAN, J. These are two appeals by the defendant, Cecil Dugger, from two judgments of the circuit court, each based upon a verdict of a jury, which adjudges him guilty of the crime of assault and battery. One of the two crimes, according to the judgments, was committed upon one Kenneth Puttkamer, and the other upon an individual named Charles Borquist. The two charges were tried concurrently. The judgments order the defendant's imprisonment in the Multnomah County jail for a term of nine months. Appeals were taken in both cases.

The two assignments of error concern instructions given to the jury; the one concerns defendant's plea of self-defense, and the other deals with the instruction required by subd. 4 of § 9-2001, Oregon Code 1930.

Dugger was jointly indicted in both instances with L. V. Wallingford, Chick Eitelman and William E. Martin. The latter three plead guilty. All four were members of a union. December 10, 1937, in the afternoon, the four met casually in the hiring hall of their union in Portland, and later Wallingford, an official of the union, drove them in his automobile to a warehouse where a picket was on duty. Here they observed a half-ton truck receiving supplies. Its driver was the

aforementioned Charles Borquist who was assisted by his fellow employee, the above-mentioned Puttkamer. When the truck left to return to the plant of its owner, Wallingford with his three companions followed it. They drove up Salmon street to Union Avenue and then north on Union. Near Taylor street, Wallingford's car passed the truck and a block or so later both cars were stopped when the traffic control light changed to red. At that point the car was immediately ahead of the truck. Dugger at once left the car and went to the right side of the truck where Puttkamer was seated beside Borquist, the driver. Then occurred the encounter upon which one of the indictments is based. So far the facts are free from dispute.

Puttkamer testified that when he saw Dugger, with whom he was unacquainted, approach the truck after the two cars had stopped, he lowered the glass window of the door, believing that Dugger desired to speak to him. But at that moment Dugger thrust his fist through the opening and struck Puttkamer a severe blow. Next, according to Puttkamer, the defendant opened the door and struck him another blow so severe that he was rendered unconscious or dazed for two or three minutes. Borquist swore that while these blows were being struck he left the truck and was at once attacked by Martin and Eitelman. Shortly they were joined by Dugger. This encounter is the basis of the other indictment. In the meantime Wallingford drove on. After Puttkamer had recovered himself he obtained refuge in a nearby gasoline filling station where a call was sent for the police. Borquist, after exchanging blows with his attackers, retreated to the filling station property and there, upon orders of someone, the three indictees withdrew. Puttkamer swore that when he

opened the window of the car he said nothing to Dugger, made no threats and no effort to strike him. He testified that the two blows which he received "were pretty heavy blows, and for a week afterward I had my face swollen, both eyes blackened." He added that a part of one of his teeth was broken off.

Borquist testified that after the traffic signal had stopped the two cars, and he and Puttkamer had seen the defendant approach, "we thought that they were going to ask why we were going to go through the picket line, or warn us against going through the picket line, and when he (Puttkamer) rolled down the window, he received a smash on the side of the head." Borquist swore that Puttkamer, prior to receiving the blow, had made no threats and no efforts to strike or fight the defendant. Continuing his description of the encounter, the witness said, "Then the door of the car was opened and he (defendant) reached in and hit him (Puttkamer) again. * * * In the meantime, the other two fellows came around to my side of the car and I got out of the truck. After I seen that, I got out rather in a hurry, figuring that I would probably get the same thing, and I was going to defend myself as best possible." He declared that while "sparring around more or less" he was "getting hit once in a while," and that finally the four got upon the filling station property where the affray ended. Borquist described Puttkamer's appearance thus: "His face looked pretty badly bruised. He had two black eyes, and his cheeks—one cheek, I know, was badly bruised."

Eitelman, as a witness for the state, testified that when the car came to a stop at Union and Belmont streets Dugger immediately got out "and went right back as if he was going back to the truck." He could

not see what took place there and testified that he (Eitelman) shortly became engaged in the fight with Borquist. Wallingford, also a witness for the state, testified that when his car reached Union and Belmont "they jumped out", meaning his three companions. Beyond seeing "the boy (Puttkamer) run for the service station," he saw nothing of the encounter for he drove on. Martin, another witness for the state, testified that when the car stopped at Union and Belmont "the other two fellows crawled out, so I crawled out too to see what all was taking place." He saw the defendant walk back to the truck, but was not sure what happened there. The other witnesses were four in number. Three were employed in places of business near that point, and the fourth was making a purchase at the aforementioned filling station. None of them saw Puttkamer receive his blows, but each in mentioning him indicated that he had been severely hurt. Each described as much as he saw of the encounter between Borquist and the other three men.

We shall now give a further narrative of the evidence concerning the second charge. Borquist swore that when the defendant left Puttkamer he joined Martin and Eitelman in their attack upon him (Borquist). Referring to them, he said that they "came up, and one of them started to take a poke at me and I got out of the car and started back at him." We quote further from his testimony:

"Q. Did or didn't Mr. Dugger come around on your side of the car? A. Yes, sir, he did.

"Q. That is all four of you were sparring? A. That is right.

"Q. You know how many times you were hit? A. Oh, I wouldnt say, three or four times."

Upon cross-examination he was asked whether or not he knew that the defendant struck him, and replied, "I can't definitely say whether he did or not. There were three of us in the middle of the street fighting, and when I would be fighting one, somebody would hit me in the back." Later, he indicated that in the midst of the encounter the defendant asked that two should leave so as to even up the fight. Eitelman swore that he did not see the defendant participate in the encounter with Borquist, but that "towards the last there he (defendant) said something about, let me have him, told Martin to let me have him." Upon cross-examination he gave this version of the incident:

"Q. Then all of a sudden Dugger said to you, 'You may take him'? A. Yes, sir.

"Q. That, you heard Dugger say? A. Yes, sir.

"Q. There isn't any question about that in your mind? A. I know that.

"Q. Now, Mr. Borquist says Mr. Dugger came out there and said, 'The two of you lay off this man; one of you take him.' A. I never heard that."

Martin testified that when he got out of the car Eitelman and Borquist were already engaged in a fight and that "I started to take part, and Dugger came up behind me and told me to stay back and let Eitelman take him." The aforementioned customer of the filling station testified that all three were fighting Borquist. He saw them "get out of this automobile and go back to this truck" and begin "to swing" at Borquist after he had retreated to a place back of his truck. Having observed this, he testified: "I walked out to the curbing and yelled to these fellows, why didn't they pick on the boy one at a time and give him a chance." Next, pointing to someone in the courtroom who apparently was the

defendant, he said: "I wouldn't exactly repeat the words he used because there are ladies present, but part of what he told me was to shut my face or he would come in there and smash it in for me." He swore that after he had uttered this protest one of the men ceased fighting, but the other two continued to swing at Borquist. Three of the other aforementioned witnesses who saw only a part of the affray declared that they saw two men fighting a third. But the filling station man, whose attention was attracted when Puttkamer ran in his station, swore, "I noticed the other three men in the street sparring with a tall boy out of the truck. * * * There were three men out there, as I say, sparring at once with this one boy." During the encounter, according to this witness, "the only thing that was said was said by this chap I was putting in the call for, and he said to them, 'Why three pick on one; why not one at a time?' or something like that."

Borquist swore that up to the time of the encounter he was unacquainted with the three indictees and had had no trouble whatever with them.

Dugger and Leonard Pietila were the only witnesses called by the defendant. Pietila had not seen the encounter and had no knowledge concerning it. His testimony concerned another matter. Dugger testified that after he had been in the hiring hall for a short time he joined the three men when they started upon their trip. We now quote from his testimony:

"We drove down to Belmont and Union. The bell turned against us just as we got down to Belmont and Union. We swung in ahead of this truck, and I don't know who it was made the statement he would ask them what the idea was, or what is the use of going through a picket line? So we got out. I walked down

on one side of the car and they went on the other. I went back to the car and the guy had the window rolled down three or four inches, and I asked him how long he was going through a picket line or what was the reason, he wasn't helping himself or anybody else. At that time he opened the door and kicked me in the stomach. I hit him, and at that time he reached down like he was going to grab something. He came out backwards; I stepped back and then he ran into the service station and got a piece of paper. In the meantime, the other fellow got out and was fighting Martin and the other one in the street. In the meantime, he took the license number before the signal changed, which I imagine took about a minute, and then he went back into the service station.''

After having testified that he had not known Puttkamer previously and had had no trouble with him, he was asked, and answered, as follows:

''A. I stepped back just as he opened the door. I seen him turn on around there. He kicked his foot out just as I went to stick my head around the door.

''Q. You stuck your head around the door? A. Yes, sir, you can imagine how a guy will be; here is the handle, here, and it is opening. I wasn't going to stand and let the door push me down. Just as he stepped out here, he kicks me. At that time the other one was piling out the other side. I don't know whether he was trying to get out, to get at me, or what.

''Q. Then you hit him? A. Yes.

''Q. You only hit him once? A. Yes.

''Q. Did you knock him back in the seat when you hit him? A. Knocked him over in the seat, like that (illustrating), and then he turned over and came out backwards, and I stepped back, figuring he was going to get out and fight. Instead, he turned and ran into the service station and he started to call the police. I went around on the other side to stop this, and he came running out with a piece of paper.''

He swore that he hit Puttkamer only once and that the blow struck the latter upon the right side, but when asked how it happened that both of Puttkamer's eyes were blackened, replied, "I don't know." He claimed that after he left Puttkamer he saw his two companions in an encounter with Borquist, and that the following then occurred. "I said, 'What is the idea, two jumping on to one?' and I said, 'No two against one' because I have been jumped on by two." What next occurred he did not disclose, nor was he asked for his version of the alleged attack upon Borquist.

■ The first exception challenges an instruction which the trial judge gave concerning the testimony of the accomplices. Section 9-2001, Oregon Code 1930, provides:

"The jury, subject to the control of the court, in the cases specified in this code, are the judges of the effect or value of evidence &ast; &ast; &ast; —they are, however, to be instructed by the court on all proper occasions, &ast; &ast; &ast; 4. That the testimony of an accomplice ought to be viewed with distrust."

The instructions stated to the jury:

"The law provides that the testimony of an accomplice should be viewed with distrust. However, in this connection, I instruct you that the credibility of such accomplice is for the jury to pass upon as they pass upon the credibility of any other witness. You may take into consideration the fact that the witness is an accomplice, the interest, if any, he may have in the case, his demeanor on the witness stand, and other matters that may affect his testimony, and if after taking these matters into consideration the testimony of the accomplice carries conviction, and you are convinced of its truth, then you are to give it the same

weight as would be given to the testimony of any other witness."

After the instructions had been completed the presiding judge and counsel for the defendant had a brief colloquy about some requested instruction which counsel terminated thus: "May I have an exception for the failure of Your Honor to give the others in the language of the statute?" Thereupon the presiding judge stated: "In order to avoid any controversy of that kind the court will give them as they are recited in the statute," and read § 9-2001 in its entirety, without comment. No further exception to the instructions concerning this section of our code was then made. In his brief the defendant reverts to the original instruction concerning § 9-2001 quoted above, and states that as originally given it "was at variance with the language of § 9-2001." He argues that the comment with which the instruction accompanied the language of the code tempered, altered and modified the latter. It is true, as is held in *Herman v. East Side Logging Co.,* 135 Or. 279, 295 P. 960; *State v. Edmunson,* 120 Or. 297, 249 P. 1098, 251 P. 763, 252 P. 84; *State v. Walters,* 105 Or. 662, 209 P. 349; and *Kennedy v. State,* 115 Ark. 480, 171 S. W. 878, all being decisions which the defendant cites, that it is error not to give upon a proper occasion an instruction required by a statute. However, in the present instance, the statutory instruction was given, not only once, but twice. The mere fact that a witness is an accomplice is no reason why the jury should not make an effort to ascertain his interest, if any, take into consideration his demeanor on the witness stand, and apply to his testimony the various other tests which experience has taught are reliable means for determining the truth of whatever one hears. The

statute states that his testimony should be "viewed with distrust" but does not demand that it should be forthwith thrown into the discard. After it has been viewed with distrust and has passed the scrutiny of the jury, it may then be believed. The challenged instruction was not erroneous: *State v. Stacey*, 153 Or. 449, 56 P. 1152.

■ The second, being the final, assignment of error is thus stated in the bill of exceptions:

"May we have an exception to the third instruction as given by the Court, beginning: 'You are instructed that if you find from the evidence that the defendant was assaulted or was in danger of being assaulted,' and so forth. Our specific exception is to this: 'and in such a situation he would be precluded by his conduct of availing himself of a necessity which was self-imposed, and which he brought upon himself,' as an instruction commenting on the evidence and invading the province of the jury."

It will be observed that the language to which an exception was taken was only a part of an instruction. Other parts to which no exception was taken stated that the right to defend oneself is based upon necessity, real or apparent, and that a person unlawfully attacked has a right to repel the attack; adding "that the assailer must have been reasonably without fault in bringing on the difficulty."

The paragraph of the instruction from which the defendant took the part quoted in his above exception follows:

"You are instructed that if you find from the evidence that the defendant was assaulted or was in danger of being assaulted, it was his duty to employ all reasonable means within his power, consistent with his own safety, to avoid the danger and avert combat,

but if you find from the evidence that the defendant provoked the assault, or if he was the aggressor in the affray, he cannot justify himself on the ground of self defense unless after provoking the difficulty he was endeavoring to withdraw from it, and in such a situation he would be precluded by his conduct of availing himself of a necessity which was self-imposed, and which he brought upon himself.''

The defendant's criticism of the part of the instruction to which he took exception is thus expressed in his brief: ''The Court, in effect, branded the appellant as an instigator and aggressor in the altercation and thereby took the question of fact from the jury.'' After quoting from *Sprinkle v. State,* 49 Tex. Cr. Reports 224, at page 225, 91 S. W. 787 his brief continues: ''From the citation of the above authority, it may be readily seen that the instruction here given was invasive of the province of the jury, in that such a charge could only be given under one of the following hypotheses: (1) that a felonious assault was committed or about to be committed on appellant * * *; (2) that a homicide was committed * * *; or (3) on the assumption that the appellant herein was the aggressor.'' It seems plain that the trial judge added the criticized instruction for the purpose of stating the legal principles which would control if the jury found that a situation, similar to the above third hypothesis, existed; that is, if the defendant was the aggressor. Certainly, the instruction did not expressly state that the defendant was the aggressor, and we find no implication of the kind to which the defendant refers. Evidently the instruction sought to avoid all indications of partisanship and intimations concerning the facts, and therefore began with the following caution: ''It now becomes the duty of the Court

to advise you as to the principles of law to be applied to the facts under consideration; but you are the exclusive judges of every question of fact in these cases.'' Another part of the instruction is the following: ''You are the exclusive judges of all the facts involved in this case, you are the exclusive judges of the credibility of every witness who has testified, and you are the exclusive judges of the weight of all evidence which has been introduced.'' They concluded with the statement: ''Let nothing that I have said during this trial or in these instructions lead you to infer that I have formed or intend to express any opinion whatever concerning the guilt or innocence of this defendant. Those are questions for your sole and exclusive determination, and my duty is done when I explain to you the principles of law applicable to the facts under consideration.''

■ We agree with the defendant that in repelling an assault it is more difficult to justify the taking of the assailant's life than the administration upon him of a mere battery; and that instructions concerning the plea of self-defense should recognize that force in an appropriate degree may be employed to repel force, if the assailant has not through unlawful conduct provoked the attack. We believe that the instructions in appropriate language recognize these circumstances, and that they conveyed to the jury a sufficient understanding of the plea of self-defense to meet the needs. Certainly, the defendant's exception did not contain an intimation that the instructions failed to give the jury a sufficient understanding of the principles authorizing one improperly assailed to employ force in meeting an attack. The suggestion that the instructions commented upon the evidence, in our opinion, is clearly without merit.

The above is a review of the assignments of error. We have found nothing that discloses error; nor do we find any basis for believing that the defendant was not given a fair trial.

It follows that the judgment of the circuit court is affirmed.

RAND, C. J., and KELLY, BEAN, BAILEY and LUSK, JJ., concur.